Karl Hinze LaGRAND, Petitioner,

v.

Samuel LEWIS, et al., Respondents.

Walter Burnhart LaGRAND, Petitioner,

v.

Samuel LEWIS, et al., Respondents.

No. CV 92–026 TUC JMR.

United States District Court,
D. Arizona.

Feb. 16, 1995.

Carla G. Ryan, Tucson, AZ, Lawrence B. Weeks, Berkeley, CA, Bruce A. Burke, Tucson, AZ, for petitioners.

Grant Woods, Atty. Gen., and Diane M. Ramsey, Asst. Atty. Gen., Crim. Appeals Section, Phoenix, AZ, for respondents.

## ORDER

ROLL, District Judge.

### INTRODUCTION

On February 17, 1984, Petitioners Karl and Walter LaGrand were convicted by a jury of first degree murder and other crimes committed in the course of a failed bank robbery. On December 14, 1984, the trial court sentenced both Petitioners to death. Petitioners seek a writ of habeas corpus from this Court, alleging that certain constitutional errors infected both the guilt and sentencing phases of their state court criminal proceedings. The requested relief is for the verdicts, or, at a minimum, their death sentences, to be set aside. The Court has consolidated both brothers' petitions into this one action.

In this order the Court reaches the merits of Petitioners' claims properly preserved for review, with the exception of the issue of the constitutionality of lethal injection as a method of execution. By separate minute entry a schedule has been promulgated to govern briefing of that issue. Also, by previous order the Court has determined that none of Petitioners' unexhausted or procedurally barred claims can be reviewed on the merits because Petitioners have failed to show cause and prejudice for their actual or constructive

procedural defaults. In this order, the Court reaches first the merits of Petitioner Karl LaGrand's claim of ineffective assistance of counsel. In consideration of that claim, the Court has conducted an evidentiary hearing and has received counsel's supplemental briefs. This order then addresses the rest of Petitioner Karl LaGrand's claims before discussing Petitioner Walter LaGrand's claims.

### Facts

The Arizona Supreme Court has set forth the facts presented to the jury during the joint trial of Karl LaGrand and his half-brother Walter LaGrand. *State v. LaGrand (Karl)*, 152 Ariz. 483, 733 P.2d 1066 (1987) and *State v. LaGrand (Walter)*, 153 Ariz. 21, 734 P.2d 563 (1987). The Court has also reviewed the trial transcripts as well as Karl LaGrand's taped statements, which were not introduced at trial but were utilized by Karl LaGrand at the sentencing hearing.

Karl and Walter LaGrand decided to rob the Valley National Bank in Marana, Arizona. Karl LaGrand placed a steak knife and electrical tape in a briefcase. He also carried a toy gun. Bandannas were placed in the briefcase so that bank employees could be gagged. Walter LaGrand admitted these matters when he testified at trial. On January 7, 1982, before the bank opened, Karl and Walter LaGrand went to a fast food restaurant located adjacent to the bank. They were in a white vehicle with a brown top. The vehicle was owned by the father of Walter LaGrand's girlfriend.

Shortly thereafter, when 20 year old bank teller Dawn Lopez arrived for work, she observed the white and brown vehicle in the parking lot of the bank. Several minutes later, as she walked past the white and brown vehicle, Walter LaGrand got out of the driver's side and asked her what time the bank opened. When she entered the bank, Walter LaGrand followed. Inside, she saw 63 year old bank manager Ken Hartsock standing by the vault with Karl LaGrand. Karl LaGrand was carrying a briefcase and displayed a gun in Dawn Lopez's presence.

The bank manager was unable to open the vault because he had only part of the vault combination. Ms. Lopez heard Walter LaGrand say: "If you can't open it this time, let's just waste them and leave."

Dawn Lopez and Ken Hartsock were moved into the manager's office. When Ms. Lopez told the bank manager that she feared they would be murdered, the manager hugged her and reassured her that the two men would leave after robbing the bank. Ms. Lopez and Mr. Hartsock had their hands bound behind their backs with black electrical tape. Walter LaGrand menaced the manager with a letter opener, holding it to the manager's throat and threatening to kill him.[1]

When bank employee Wilma Rogers arrived for work and observed the unfamiliar vehicle in the parking lot, she placed a phone call to the bank from a nearby store. Karl LaGrand told Ms. Lopez to answer the telephone but warned her that "if you let them know we're in here we're going to shoot you." Ms. Lopez answered the phone and, while Karl LaGrand listened to the conversation, told Ms. Rogers that the manager was not at the bank. Ms. Rogers told Dawn Lopez that Dawn's headlights were on and if Ms. Lopez did not exit the bank and turn them off, Ms. Rogers would contact law enforcement officials.

Dawn Lopez was permitted to leave the bank to turn off her headlights. Before she left the bank building, however, Karl or Walter LaGrand warned her that if she did not return, "we'll just shoot him and leave. We're just going to kill him and leave."[2] She went to her car, turned off the lights, and courageously returned to the bank.

Upon Ms. Lopez's return, her hands were once again taped behind her back. She was placed in a chair facing a corner of the room. The bank manager remained bound and gagged in the same chair he had been in previously. When Ms. Lopez heard sounds of a struggle, she stood up and turned to help

---

1. In addition to other evidence on this matter, Walter LaGrand testified that he held the letter opener to the bank manager's neck.

2. Walter LaGrand testified that he warned Ms. Lopez that he would shoot the bank manager if she didn't return.

the manager. She observed Karl LaGrand holding the manager from behind and Walter LaGrand standing in front of the manager. Walter LaGrand then came toward her and began stabbing her. After she fell to the floor, she could see only feet and Mr. Hartsock lying facedown on the floor. Twice she heard: "Just make sure he is dead."

Walter LaGrand testified that he had been outside when the stabbings occurred and that when he went back into the bank, he told Karl LaGrand to gather up his things and to place them in his briefcase. Karl and Walter LaGrand left the bank.

When emergency personnel arrived at the scene, Ken Hartsock was already dead. He had been stabbed twenty-four times. All of the stab wounds were inflicted to the frontal side of his body and his hands were still bound behind his back by electrical tape. Some wounds were consistent with having been inflicted with a steak knife, though most could have been inflicted by a steak knife or a letter opener. Karl LaGrand's fingerprint was found inside the manager's office. The steak knife brought to the bank by Karl LaGrand was also found in the office. Dawn Lopez survived despite stab wounds to her head, neck and side. She suffered a collapsed lung and was hospitalized three weeks as a result of her injuries.

Walter LaGrand testified that after the failed robbery, he disposed of Karl LaGrand's briefcase in a wash. When it was recovered by the police, it was found to contain Ken Hartsock's letter opener, Dawn Lopez's keys, and Karl LaGrand's jacket.

Because Wilma Rogers had written down the license plate number of the white and brown vehicle, the police soon learned that this vehicle was registered to the father of Walter LaGrand's girlfriend. After Karl and Walter LaGrand returned to the apartment, Walter LaGrand took a nap until he was awakened by the phone ringing. His girlfriend, Karen Libby, left the bedroom to answer it. Walter LaGrand then heard his girlfriend screaming at his brother:

F___ a__hole, you used my car to rob a bank. You killed a man, and the Feds are over at my dad's house, and they're coming over here.

Shortly thereafter, Karl, Walter, and Walter's girlfriend were arrested in the vehicle after surveillance agents observed them leave the apartment. When the apartment was searched, the police found a steak knife similar to the knife found at the bank.

Following the arrest of Karl and Walter LaGrand, Karl LaGrand confessed.

### *Procedural Background*

Karl and Walter LaGrand were convicted by a jury of first degree murder of Ken Hartsock, attempted murder of Dawn Lopez, attempted armed robbery, and kidnapping of Mr. Hartsock and Ms. Lopez. Both Karl and Walter LaGrand were sentenced to death for the murder of Ken Hartsock.

David Gerson was Karl LaGrand's lawyer at trial and through sentencing. Bruce Burke has been Walter LaGrand's attorney since prior to trial.[3]

Karl and Walter LaGrand separately appealed their convictions to the Arizona Supreme Court. The convictions and death sentences were affirmed. *State v. LaGrand (Karl)*, 152 Ariz. 483, 733 P.2d 1066 (1987) and *State v. LaGrand (Walter)*, 153 Ariz. 21, 734 P.2d 563 (1987). Karl and Walter LaGrand thereafter filed petitions for writ of certiorari, which were denied by the United States Supreme Court. In 1989, the Pima County Superior Court denied post-conviction relief. In 1990, the Arizona Supreme Court denied review. On June 28, 1991, the U.S. Supreme Court denied certiorari of post-conviction relief claims. In March of 1993, Petitioners' memoranda in support of their applications for habeas corpus relief were filed in U.S. District Court.

Although Petitioners Karl and Walter LaGrand filed separate petitions for writ of habeas corpus, due to some similar claims arising from their joint trial, the petitions were consolidated into this single action.

---

**3.** Walter LaGrand entered a waiver of any potential claims of ineffective assistance of counsel

and Mr. Burke indicated to the Court that he believes no such grounds existed.

## KARL LAGRAND'S PETITION

### Ineffective assistance of counsel

Petitioner Karl LaGrand, in his habeas corpus petition, presents a claim of ineffective assistance of counsel. He alleges that his attorneys rendered ineffective assistance of counsel prior to trial, at trial, during the mitigation hearing, in other post-trial proceedings, and on appeal.

An evidentiary hearing was conducted in connection with Petitioner's claim of ineffective assistance of counsel. Attorneys representing Walter LaGrand as well as previous attorneys for Petitioner testified on behalf of Petitioner. The Court has reviewed pertinent transcripts of proceedings and Petitioner's confessions offered at his mitigation hearing. Counsel have also submitted supplemental written arguments and Petitioner has submitted a proffer consisting of affidavits of attorney Robert J. Hirsh and others and documents Mr. Hirsh relies upon in formulating his opinions.

### Discussion

■ The procedure to be used in analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court must conduct a two prong analysis: (1) was counsel's performance deficient, and (2) did any deficient performance prejudice the defendant. *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

In analyzing a claim of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.,* 466 U.S. at 689, 104 S.Ct. at 2065. "[E]very effort [must] be made to eliminate the distorting effects of hindsight.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.*

Preliminarily, the evidentiary hearing concerning Petitioner's claim of ineffective assistance of counsel was limited to the first prong of *Strickland,* that is, whether counsel's performance was deficient. In order to establish deficient performance, Petitioner was required to demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

## 1. POSSIBLE DEFENSES

### A. Impulsivity

Karl LaGrand argues that the lawyer who represented him at trial and at sentencing, David Gerson, failed to introduce evidence of impulsivity.

■ Petitioner contends that a defense of impulsivity should have been used by defense counsel to reduce the seriousness of the first degree murder charge. The state, however, alleged that Petitioner had committed first degree murder in two ways: under a theory of felony murder and by virtue of premeditation. When the jury found Petitioner and Walter LaGrand guilty of first degree murder, it did not indicate whether their verdicts were based upon premeditation, felony murder, or both theories. Impulsivity evidence would have been irrelevant to the felony murder allegation, unless Petitioner was so impulsive as to be unable to form the intent to rob. Such a claim was untenable in light of evidence of preparation for the robbery.

Petitioner points to *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981), as authority for the proposition that evidence of impulsivity can be introduced at trial in order to reduce first degree murder to second degree murder. In *Christensen,* however, the defendant was charged with having committed the premeditated murder of his wife. There, no evidence supported a claim of felony murder. Christensen was not otherwise engaged in the commission of a felony when the alleged murder occurred. He was guilty of first degree murder, if at all, because he had premeditated her murder. Here, unlike in *Christensen,* stronger evidence of impulsivity would not have provided Petitioner with an effective defense to first degree murder because it would not have negated any element of felony murder.

Furthermore, in *Strickland* the Supreme Court stated: "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even

harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." 466 U.S. at 691, 104 S.Ct. at 2066. Prior to Ken Hartsock being stabbed, Walter LaGrand had stated that he was going to kill the bank manager if the bank manager was lying about being unable to open the vault. Before Dawn Lopez was permitted to leave the bank to turn off her headlights, she was told that if she did not return, Ken Hartsock would be killed. The bank manager was stabbed twenty-four times and Dawn Lopez was stabbed at least seven times. After Ken Hartsock was repeatedly stabbed, either Petitioner or Walter LaGrand was overheard to say: "Just make sure he's dead." Ms. Lopez testified that she heard both Petitioner and Walter LaGrand make such a statement. This evidence belies a claim of impulsivity.

In any event, to say that Petitioner's lawyer ignored evidence of impulsivity is factually incorrect. Walter LaGrand testified at trial that after the two left the bank, Petitioner stated that he had panicked: "[Petitioner] tells me how he panicked, how the man got up and tried to kick him and kicked him when he went over to sit the lady down." Walter LaGrand testified that Petitioner was "breathing real heavily, his nose bleeds. He's still in shock."

During summation, Petitioner's counsel argued that after Ken Hartsock kicked Petitioner, "a violent, unfortunate reaction struck out. He did not intend to hurt anybody."

The claim that Petitioner's lawyer was unaware of the *Christensen* decision is conclusively disproved by the state's tender of *State v. Ramos,* 133 Ariz. 12, 648 P.2d 127 (App.1981), *vacated,* 133 Ariz. 4, 648 P.2d 119 (1982). Ramos was represented by Gerson on appeal and *Christensen* was discussed in these appellate decisions.

Petitioner's counsel's failure to further pursue an impulsivity defense did not constitute deficient performance.

### B. Insanity

■ Petitioner suggests that his counsel rendered ineffective assistance because counsel failed to present an insanity defense.

Neither the report of psychologist Dr. Lewis Hertz or psychiatrist Dr. Edward Meshorer suggests that an insanity defense was available to the defendant. Dr. Hertz's report, which was prepared prior to trial, contained the following statement: "Karl stated that he knew right from wrong . . . ." While Dr. Meshorer's report does not address the *M'Naughten* Test for insanity, it gives no hint of an insanity defense having been a viable option for Petitioner. The Arizona Supreme Court pointed out that "no evidence of *M'Naughten* insanity existed." *LaGrand (Karl),* 152 Ariz. at 485, 733 P.2d at 1068.

In rejecting this claim as a basis for a finding of ineffective assistance of counsel, the Arizona Supreme Court stated that "not pursuing an insanity defense precluded opening Karl's juvenile record to inspection and exposing . . . his past to scrutiny." *Id.* Arizona permits such evidence in order to shed light on the entire life of someone claiming insanity. *Id.* This includes evidence of juvenile violations. *State v. Rodriguez,* 126 Ariz. 28, 31, 612 P.2d 484, 487 (1980).

Had Petitioner's counsel opened the door to Petitioner's past, the jury would have learned of a lengthy and violent criminal history. Petitioner's presentence reports indicate that less than three months before the events of this case occurred, on two separate occasions the defendant committed armed robberies and kidnappings at Tucson grocery stores, and had prepared to commit another armed robbery at a third grocery store. When the murder of Ken Hartsock occurred, he had been released on bail while awaiting trial for armed robbery and kidnapping.

As a juvenile, Petitioner was adjudicated delinquent for multiple burglaries, armed robbery and kidnapping.

In the absence of any evidence in support of an insanity defense and in light of the extremely damaging evidence which would have been admissible under Arizona law had such a defense been presented, failure to pursue an insanity defense did not constitute deficient performance.[4]

4. Karl LaGrand now suggests that his attempt to

assume full responsibility for the murder is

## 2. SUPPRESSION OF CONFESSION

■ Petitioner points to the fact that his lawyer initially sought suppression of his confessions based upon violation of *Miranda* as well as on voluntariness grounds. After Karl LaGrand's previous attorney obtained suppression of Petitioner's confessions, Petitioner's counsel reconsidered the wisdom of having obtained an adjudication of involuntariness. Because an involuntary confession is inadmissible for any purpose, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), a determination of involuntariness would have precluded Petitioner from using the statement in any context, including sentencing proceedings should conviction occur, because of the untrustworthiness of the confession. The Arizona Supreme Court discussed the circumstances surrounding this change in strategy in *State v. LaGrand (Walter)*, 153 Ariz. at 25–26, 734 P.2d at 568.

Petitioner's confessions, while evidencing impulsivity, also contained highly incriminating statements tending to place the entire blame for Ken Hartsock's death on Petitioner. *LaGrand (Walter), Id.*

In the taped confession made on the evening of January 7, 1982, at an office of Arizona Department of Public Safety, Petitioner told a detective that he had conducted surveillance on the bank two days before the attempted robbery, used a police scanner during the robbery, bought a toy gun the day before the robbery to use during the robbery, and picked that bank because it was "away from town" and near the freeway.

In a second taped statement made after midnight on January 8, 1982, Petitioner told the detective that he used a letter opener to stab both victims, threw the toy gun and letter opener away, had been responsible for taping the manager's hands behind his back, and knew his actions were wrong.

symptomatic of insanity. The physical evidence, including the absence of stab wounds to the back of the victim, strongly suggests that two people collaborated in the assault on Mr. Hartsock, with one person holding him from behind and the other stabbing him from the front. This coincides with the eyewitness account of the murder.

Petitioner's counsel's decision to seek retraction of the trial judge's ruling to the extent that the court had ruled that his confessions were involuntary enabled Petitioner to exclude the confessions at trial unless Petitioner testified and yet allowed the confessions to be used at the mitigation hearing. *LaGrand (Walter)*, 153 Ariz. at 26, 734 P.2d at 568. In fact, at the mitigation hearing Petitioner's attorney played recordings of Petitioner's confessions. This strategy enabled Petitioner to exclude the confessions when they would have been most damaging, *i.e.*, at trial, yet utilize them in connection with sentencing.

This does not indicate deficient performance.

## 3. TRIAL ISSUES

Petitioner argues that his attorney rendered ineffective assistance of counsel because he did not make an opening statement, examined only two of eighteen witnesses called by the state, and, just before closing argument, mentioned to Walter LaGrand's attorney that an argument concerning reasonable doubt used in a trial in another state might be utilized by Petitioner's counsel.

### A. Failure to give an opening statement

■ Petitioner asserts that his counsel waived opening statement. The record reflects that after co-counsel delivered his opening statement, Mr. Gerson *reserved* opening statement. This means that he chose to wait until hearing all of the government's evidence before making an opening statement. This procedure is expressly provided for under the Arizona Rules of Criminal Procedure. Ariz.R.Crim.P. 19.1(a)(3). Because Petitioner ultimately presented no evidence, the opportunity to give an opening statement later was lost. This does not constitute deficient performance.

In light of the overwhelming nature of the evidence against both Karl and Walter LaGrand, a far more plausible explanation of Petitioner's attempt to assume full responsibility is that Petitioner thought he might thereby at least exculpate his brother.

As with a substantial portion of Petitioner's counsel's testimony at the evidentiary hearing on ineffective assistance of counsel, Mr. Gerson stated that he could not recall why he had waived opening statement.

### B. Failure to examine the bulk of State's witnesses

Petitioner's counsel cross-examined only two of the state's eighteen witnesses. One of these witnesses, however, was Dawn Lopez, the only eyewitness to the slaying of Ken Hartsock and the attempted murder of Ms. Lopez.

■ In concluding that Gerson's conduct did not constitute ineffective assistance, the Arizona Supreme Court pointed out that Bruce Burke, Walter LaGrand's attorney, "did an excellent job of cross-examining" the state's witnesses. *LaGrand (Karl)*, 152 Ariz. at 485, 733 P.2d at 1069. At the evidentiary hearing, counsel for the state pointed out that the order of examination of witnesses resulted in Mr. Burke cross-examining each witness prior to Mr. Gerson having that opportunity. Accordingly, it would have been inappropriate for Petitioner's counsel to repeat the same matters on cross-examination that were asked by co-counsel. *See, e.g., Carriger v. Lewis,* 971 F.2d 329, 333 (9th Cir.1992) (trial court has discretion to limit redundant cross-examination). Under these circumstances, counsel's performance was not deficient.

Evidence was presented at the hearing that Petitioner's counsel was provided the various reports and statements of witnesses, as well as transcripts of interviews of the various witnesses conducted by co-counsel. These items were reviewed by Petitioner's counsel.

The Arizona Supreme Court concluded that while Gerson "kept an exceedingly low profile, we cannot say that his performance was so deficient as to compromise the adversarial nature of the trial." *LaGrand (Karl)*, 152 Ariz. at 486, 733 P.2d at 1069. As the Arizona Supreme Court pointed out and as nearly every witness at the evidentiary hearing agreed, the evidence against Petitioner was quite substantial. Evidence of impulsivi-

ty was presented to the jury by Petitioner through the cross-examination of Dawn Lopez and during closing argument. At trial, the strategies of respective defense counsel were not nearly as antagonistic as is now suggested. Evidence against both Karl and Walter LaGrand overlapped. Questions asked by co-counsel, who went first, oftentimes inured to the benefit of Petitioner. For example, Walter LaGrand's attorney extensively cross-examined Dawn Lopez regarding prior inconsistent statements indicative of uncertainty as to some details. Walter LaGrand's expert regarding flaws associated with eyewitness testimony benefitted Petitioner as well as Walter LaGrand. Counsel's performance was not deficient.

### 4. MITIGATION HEARING

■ Petitioner also alleges that his counsel rendered ineffective assistance at the mitigation hearing.

Petitioner was convicted of first degree murder of Ken Hartsock. The state possessed substantial evidence that Mr. Hartsock was murdered during an attempted robbery and his murder was premeditated.

The evidence against Petitioner was vast and compelling. Counsel attempted to convince the judge that Mr. Hartsock's twenty-four stab wounds were inflicted as a result of impulsivity. Petitioner's counsel presented testimony from Dr. Edward Meshorer, a psychiatrist with extensive forensic experience. Counsel's evidence included the reports of Dr. Meshorer and Dr. Lewis Hertz. Dr. Hertz is a clinical psychologist. These reports addressed the effect of stress on Petitioner and the absence of premeditation. Dr. Hertz's report stated in part: "When frustrated, he suddenly becomes belligerent, irritable, and demanding. Stress may be conducive to increased impulsivity and to transitory disruptions." Dr. Meshorer's report quoted Petitioner regarding the attempted robbery: "I never expected to get into the trouble that I got in to. I figured that it was going to be an easy job, that nobody would get hurt. I didn't wish to hurt nobody nor nothing. I just lost control." Dr. Meshorer also stated in his report:

He claims that the murder was not premeditated. He just happened to pick up a letter opener which was handy that was on the manager's desk. Unlike many letter openers, this one was fairly sharp at the end.

. . . .

It is fairly obvious that Karl had no intention of killing the bank manager. . . . Furthermore, evidence of lack of premeditation was presented at the mitigation hearing through the testimony of Dr. Meshorer. Counsel also played Petitioner's confessions for the court. Throughout the two confessions made by Petitioner, there are references to the absence of any intention of harming the victims and to a state of panic experienced by Petitioner.

Counsel did not perform deficiently in presenting evidence of impulsivity in this fashion.

At the mitigation hearing, co-defendant Walter LaGrand called two witnesses: Dr. David Gurland, a Tucson psychiatrist, and Pat LaGrand, the half-sister of Petitioner and Walter LaGrand. The testimony of Petitioner's sister also offered insight into the family life of Petitioner. During the sister's testimony, questions asked by the co-defendant's attorney frequently encompassed both the co-defendant and Petitioner.

Without reviewing the previously discussed evidence, the evidence against Petitioner was overwhelming. Eyewitness testimony, co-defendant testimony, physical evidence, and other damning matters left no doubt that Petitioner participated in a vicious assault upon an incapacitated bank manager and upon a 20 year old female teller during a bank robbery gone awry.

Petitioner presented nothing more than bare allegations regarding additional deficiencies in post-trial proceedings.

Petitioner's counsel's conduct did not constitute deficient performance.

■ Attorney David Gerson testified that Petitioner "deserved better" representation than Gerson gave him. Self-condemnation by former counsel in this context is not decisive. *Atkins v. Singletary*, 965 F.2d 952, 959–60 (11th Cir.1992); *Harris v. Dugger*, 874 F.2d 756, 761 n. 4 (11th Cir.1989), *cert. denied*, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); *Middleton v. Evatt*, 855 F.Supp. 837, 841 n. 4 (D.S.C.1994).

### 5. ON APPEAL

Although Petitioner suggests the representation by counsel on appeal was ineffective, nothing but bare allegations have been advanced in this regard.

### *Remaining Claims*

The Court next examines Petitioner Karl LaGrand's remaining claims properly preserved for review before turning to claims raised in Petitioner Walter LaGrand's petition.

### *Excusing a juror who disfavored capital punishment*

Petitioner next argues that the trial court committed constitutional error when it dismissed for cause a prospective juror who stated she might be influenced, in deliberating on the verdict, by her strong opposition to capital punishment. Petitioner contends that this prospective juror was not excludable under *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), because she did not explicitly state that her philosophical views would either prevent or substantially impair her performance as a juror. Upon direct review, the Arizona Supreme Court noted the ambiguous and somewhat contradictory responses of this prospective juror during *voir dire*, and upheld the trial court's finding of excludability. The Court used a deferential ("fairly supported by the record") standard of review, citing *Wainwright v. Witt*, 469 U.S. 412, 433–34, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985), as support for this standard.

■ The Court must deny Petitioner relief on this claim for two reasons. First, the right vindicated by the progeny of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), cited by Petitioner, is the right to be impartially sentenced. As a jury plays no role in Arizona in determining the sentence, this right cannot be infringed even were a

prospective juror to be improperly excluded. *Evans v. Lewis*, 855 F.2d 631 (9th Cir.1988). Petitioner tries to distinguish this case from *Evans* by claiming, without citing any authority, that the right at stake here is not his right to be impartially sentenced, but rather his "right to have confidence in the fairness of the criminal judicial system which tries him for a capital offense." The Court concludes that this case is not distinguishable from *Evans* and that its holding controls.

 Second, even if *Evans* did not control, the question of juror partiality is a fact question, resolutions of which made by the trial court must be accorded substantial deference on collateral review. *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir.1988). Like the Arizona Supreme Court, this Court concludes that it must apply *Wainwright*'s "fairly supported by the record" standard. Under this standard, the trial court's exclusion of this prospective juror is not manifestly erroneous. Therefore, Petitioner has not demonstrated constitutional error here.

### Denial of motion for a change of venue based upon pretrial publicity

 Petitioner argues that the trial court committed constitutional error when his motion for a change of venue based on extensive pretrial publicity was denied. The relevant question before the Court is whether the jurors at Petitioner's trial had such fixed opinions that they could not judge impartially the guilt of the defendant. *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). This is a factual inquiry, and the findings of historical fact made by the trial court are to be treated as presumptively correct on collateral review. 28 U.S.C. § 2254(d); *Patton, supra; Greenawalt v. Ricketts*, 943 F.2d 1020, 1029 (9th Cir.1991). Petitioner's counsel argued this issue to the trial judge, who was in a far better position to determine the biases and prejudices of the prospective jurors. The trial court denied Petitioner's motion for a change of venue based on pretrial publicity after a full and fair hearing. Transcript of February 3, 1984 at 700. This Court, after independently reviewing the record, *Harris*, 885 F.2d at 1360, will overturn that decision only upon a show-

ing of manifest error. *Patton*, 467 U.S. at 1032, 104 S.Ct. at 2889.

 Petitioner argues that the facts of this case meet both the presumed prejudice and actual prejudice standards, either of which will require this Court to set aside the verdict. The presumed prejudice standard applies where the community in which the trial was held was saturated with prejudicial and inflammatory pretrial publicity. *Rideau v. Louisiana*, 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). The presumed prejudice principle is rarely applied and is reserved for extreme situations. *Harris*, 885 F.2d at 1361 (citations omitted).

 In *Rideau*, a local TV station broadcast the accused's videotaped confession three times in a parish of only 150,000 people. Three jurors actually saw the confession. The facts here do not approach those of *Rideau*. The Court has examined Petitioner's exhibits D and E, consisting of newspaper and television reports related to the crime, his and his brother's arrests, and other controversies involving police response time and procedures for releasing suspects prior to trial. The exhibits show that the crimes did arouse interest in the Tucson area, as the two local newspapers ran front-page stories on the crimes in the days immediately following, including reporting on the arrests. However, the stories quickly dropped to the lower portion of the front page, then to the inside pages, and after a few weeks, the stories ran only sporadically as new developments occurred, such as Petitioners' trials and sentencings on unrelated armed robbery and kidnapping charges. These stories were factual in nature and not inflammatory. Although both local newspapers ran either unedited, or in the case of *The Citizen*, slightly edited, versions of the transcript of the surviving victim's 911 call (*The Arizona Daily Star*, Jan. 21, 1992 at A6 and *The Tucson Citizen*, January 21, 1992 at 5A), the sympathy that might have been aroused does not approach the intensity or degree of saturation which the Supreme Court held to require a change of venue in *Rideau*.

Very soon after their arrest, the news stories changed their focus from Petitioners and the crime itself, to controversies relating to the response time of the Marana Town Marshall and the circumstances surrounding Walter LaGrand's release from jail less than twenty-four hours before these crimes occurred. Editorials called for a calm and measured response. The effect of the printed media coverage submitted on this issue was not to inflame the passions of the community against Petitioners, but rather its purpose obviously was to inform the public of the performance of local governmental bodies. Furthermore, Petitioners were tried two years after the vast majority of these stories had run. The passage of time is an important factor in assessing community reaction. *Patton,* 467 U.S. at 1034, 104 S.Ct. at 2890. Under these facts prejudice will not be presumed.

 Nor can Petitioner establish actual prejudice. The relevant question under this standard is whether the jurors demonstrated actual partiality or hostility that could not be laid aside. *Harris,* 885 F.2d at 1355 (citations omitted). A key factor in this analysis is the percentage of prospective jurors who were excused for cause based on a preformed opinion of the case, as this can indicate concern over the reliability of *voir dire* responses of the remaining potential jurors. *Id.* However, merely having been exposed to pretrial publicity does not raise an inference of partiality. *Id.* Here, Petitioner claims that because 14 of the potential jurors called were excused for having a preformed opinion of the guilt of Petitioner and Walter LaGrand or for exposure to pretrial publicity, an inference of juror partiality must be made. This is incorrect. First, as indicated above, mere exposure to publicity is not the relevant question; rather, this factor focuses on the number of potential jurors who admit to a preformed disposition to convict based on the publicity. After independently reviewing the record, the Court finds that only seven prospective jurors were dismissed for this reason. This constitutes a lower percentage (15 percent) than was found acceptable in *Harris, supra,* (18 percent) or in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (26

percent). Second, it is apparent from the record that careful attention was given to potential juror bias by both the trial court and defense attorneys during *voir dire.* The court allowed for extensive individual *voir dire* and dismissed a number of jurors, not based on preformed opinion, but simply based on knowing "a little too much" about the case. The Court will not draw an inference of juror partiality, as Petitioner suggests, from the precautions taken by the trial court.

 Petitioner also argues that actual prejudice is shown because four prospective jurors had read a recent newspaper article chronicling the disagreement between Petitioner and his trial counsel over the quality of his representation. No possible prejudice can be inferred from this fact because three of the four were dismissed for this reason, and the other one, who did not serve on the jury, stated under oath during *voir dire* that neither reading that article nor having been exposed to previous publicity predisposed him to either side. The trial court's finding that this juror was not biased is a fact question that this Court cannot overturn absent a showing of manifest error. Petitioner has failed to do this. Based on the facts presented, Petitioner has failed to carry his burden of demonstrating actual juror bias.

### Denial of motion for new counsel

 In this claim, Petitioner argues that the trial court committed error when it denied his motion to change counsel before trial. The denial of a motion to change counsel will only be reversed upon a showing of abuse of discretion. *United States v. Machor,* 879 F.2d 945 (1st Cir.1989).

 The trial court heard argument on this motion the day before trial, and questioned Petitioner at length as to why he wanted to change counsel. Petitioner based his motion on his evaluation of his counsel's performance to date. The trial court at the time of the hearing, the Arizona Supreme Court on direct review, and this Court have all concluded that Petitioner did receive or was receiving at least the minimally acceptable level of effective assistance of counsel.

Petitioner also complained that his counsel was not visiting him enough. The Sixth Amendment does not guarantee a meaningful relationship with one's attorney. *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). There was no constitutional violation here.

■■■ Petitioner also argues that this Court should extend the holding of *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), that an accused has a right to counsel at each critical stage of prosecution, to the situation here. He argues that he was effectively unrepresented at the hearing on his motion for a change of counsel because his interests conflicted with those of his attorney at this hearing. Even if Petitioner's interests so diverged from his attorney's that it would be correct to conclude that he was constructively unrepresented, this Court declines Petitioner's invitation that it define a hearing on a motion to change counsel as a critical stage in prosecution. Such a ruling would effectively create a new right under the Sixth Amendment to the appointment of a second counsel at such hearings. The facts here do not warrant such a novel extension of the law interpreting the Sixth Amendment.

### *Denial of requested intoxication instruction*

■■■ In this claim, Petitioner argues that the trial court committed constitutional error when it denied Petitioner's requested jury instruction relating to intoxication. He argues that the evidence in the record could have allowed a reasonable jury, properly instructed, to find that his state of intoxication at the time of the crimes prevented him from forming the necessary culpable mental state. At this stage, Petitioner bears a heavy burden in attacking the propriety of jury instructions. *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). Petitioner must show that the lack of such an instruction so infected the entire trial that the resulting conviction violates due process. *Id.* at 154, 97 S.Ct. at 1737. This is an especially high burden in this case, because the jury could have returned its verdict of first degree murder based on a theory of felony murder. Felony murder uses as its requisite mental state the defendant's intent to commit the underlying felony. Petitioner cannot seriously contend that he was so intoxicated he was incapable of forming the intent to rob the bank. As the jury also convicted Petitioner of the underlying felony, all the elements of felony murder were established beyond a reasonable doubt. Also, the trial judge, well aware of the law that this instruction would have imparted to the jury, found beyond a reasonable doubt that the murder was premeditated. Under these circumstances, even if the trial court erred in not instructing the jury on this theory, it was harmless error beyond a reasonable doubt.

■■■ In any event, a review of the trial record establishes that there was insufficient evidence to support such an instruction. More than mere evidence of consuming alcohol and smoking marijuana is needed. Evidence allowing for a finding of impairment needs to be present. *State v. Cruz–Mata,* 138 Ariz. 370, 374, 674 P.2d 1368, 1372 (1983). Walter LaGrand's uncontradicted testimony was that after partying the evening before, he and Karl LaGrand stayed up all night discussing the details of the planned robbery. Petitioner drove to Marana because Walter LaGrand did not know the location of the bank. Nothing in Walter LaGrand's or Dawn Lopez's testimony of the events that morning supports a finding of impairment. In Petitioner's taped confession of January 7, 1992, at 10:20 p.m., Petitioner told the detective that before going to the bank he had consumed one beer, no other intoxicants, and no drugs. Karen Libby did testify that she saw the brothers upon their return to the apartment after the murder and that they looked "different." In answer to a direct question as to whether she thought they were intoxicated, she said "I don't know." Something more than this is necessary to support the requested instruction. Therefore, the trial court did not err.

### *Age as a mitigating factor*

■■■ In this claim, Petitioner argues that the sentencing judge committed constitutional error by not according greater weight to the fact that Petitioner was 19 years old at

the time of the offense. The United States Supreme Court requires that the sentencing court must be allowed to consider any relevant evidence offered by a capital defendant in support of a sentence other than death. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Woratzeck v. Lewis*, 863 F.Supp. 1079 (D.Ariz.1994). The court, however, is not required to find the evidence mitigating, or to accord the evidence the weight a defendant believes is appropriate. *Eddings*, 455 U.S. at 113–114, 102 S.Ct. at 876–77. The record reflects that the trial court and Arizona Supreme Court found this to be a mitigating factor, but not of sufficient weight to merit a more lenient sentence. *LaGrand (Walter)*, 153 Ariz. at 37, 734 P.2d at 573. As both the trial court and the Arizona Supreme Court considered this factor, there is no constitutional violation.

### Abused childhood as mitigating factor

Petitioner claims that the sentencing court failed to consider sufficiently Petitioner's childhood as a mitigating factor. For the same reason explained above in the discussions concerning Petitioner's claims relating to other mitigating evidence, the Supreme Court does not require that a court give mitigating evidence any particular weight, only that it be considered. This factor was considered, and so there is no constitutional violation.

### Cruel, heinous or depraved aggravating factor

In this claim, Petitioner contends that the sentencing court committed constitutional error when it found that the aggravating factor of cruel, heinous or depraved from A.R.S. § 13–703(F)(6) applied to this crime. Petitioner is not contending that the statute as interpreted by the narrowing case law is unconstitutional, because the Supreme Court has already decided it is. *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990). Rather, Petitioner argues that the facts here do not support such a finding. This Court is mindful that findings of fact relating to aggravating factors will not be disturbed on collateral review

absent a showing that no rational fact-finder could have found the factor to apply. *Lewis v. Jeffers*, 497 U.S. 764, 779, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990).

Petitioner argues that it was error for the Arizona Supreme Court to have "reasonably assumed" that Ken Hartsock underwent physical suffering in the course of being stabbed twenty-four times. He complains that the Court did not make, beyond a reasonable doubt, a specific finding of fact. Yet the trial court made such an explicit pronouncement, and in reviewing the record, the Arizona Supreme Court found sufficient evidence to uphold that finding. *LaGrand (Walter)*, 153 Ariz. at 36, 734 P.2d at 579. In the same way, the Arizona Supreme Court found sufficient evidence in the record to uphold the trial court's finding of heinous and depraved factors. *Id.* Clearly, there is no constitutional error here.

### Pecuniary gain aggravating factor

Petitioner argues that the Arizona Supreme Court misapplied its own standard for finding pecuniary gain, and in this case applied an overly broad definition. In determining whether a state court's application of a constitutionally permissible aggravating factor was so erroneous as to raise an independent due process or Eighth Amendment violation, the standard of review is whether any rational finder of fact could have reached the same conclusion. *Lewis v. Jeffers*, 497 U.S. at 779, 110 S.Ct. at 3102. Here, the sentencing court found beyond a reasonable doubt that the murder was motivated by the expectation of the receipt of something of value, and the Arizona Supreme Court concurred with this finding. The Arizona Supreme Court stated that Petitioner's goal of robbing the bank so permeated Petitioner's conduct that the murder can be deemed to have been committed in furtherance of that goal. *LaGrand (Walter)*, 153 Ariz. at 36, 734 P.2d at 578. As that conclusion is neither irrational nor arbitrary, there is no constitutional violation.

Petitioner also argues that the Arizona Supreme Court expanded its definition of pecuniary gain in his case, and its application to him violates the Due Process Clause

because it is analogous to an *ex post facto* law. Even if the Arizona Supreme Court did expand its definition of pecuniary gain in his case, relief is not warranted. While a state court's construction can so broaden a criminal statute that its application in the very case it is announced would violate the Due Process Clause, *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), that is not the case here. Petitioner was on notice that if he committed murder, and a rational court found it to have been committed for pecuniary gain, he risked being sentenced to death. This is all the notice that the Constitution requires. That murderers ought to be able to legally rely on existing case law precisely defining aggravating factors is much too fine a legal argument to withstand scrutiny. Such a rule would not vindicate the interest sought to be protected by prohibiting *ex post facto* laws: that reasonable people conform their conduct to the law, and conduct which conformed at the time committed ought not to be punished because the law was later changed. This premise does not apply here because first, any refinement in the Arizona Supreme Court's interpretation of pecuniary gain is not of such substantive quality as to trigger *ex post facto* concerns and, in any event, it is doubtful that murderers conform their behavior to avoid current notions of aggravating factors. Petitioner has failed to show otherwise.

### Prior criminal record as aggravating factor

This claim was dismissed on the merits in the previous order of this Court dealing with the issues of cause and prejudice.

### WALTER LAGRAND'S PETITION

The remainder of this order addresses only claims unique to Petitioner Walter LaGrand's petition. Any claims raised in Walter LaGrand's petition that the Court has already discussed in the context of Karl LaGrand's petition are denied for the same reasons and are not set forth below.

### Exclusion of Karl LaGrand's confession

Petitioner Walter LaGrand's first argument is that the trial court and Arizona Supreme Court committed errors of constitutional dimensions when they ruled that Karl LaGrand's confessions were inadmissible under Arizona's Rule of Evidence 804(b)(3)'s exception to the hearsay rule.[5]

Karl LaGrand made two separate confessions on the day of his arrest. In his confessions, Karl LaGrand assumes sole responsibility for stabbing Ken Hartsock, which he said occurred after Mr. Hartsock provoked him by kicking him in the leg. These confessions exonerate Petitioner Walter LaGrand because they place him outside the room where the murder occurred.

Petitioner was prevented from introducing these confessions at trial because the trial court ruled that they did not meet Rule 804(b)(3)'s test for reliability.[6] While the Arizona Supreme Court concluded that the trial court's ruling was correct, it announced and applied to these facts a new judicial interpretation of Rule 804(b)(3). The Supreme Court compiled a list of seven non-exclusive factors that might bear on the reliability of a hearsay confession, but limited the review allowed to a judge to corroborating and contradicting evidence appearing in the record "because this factor alone, unlike all other factors, in and of itself directly suggests trustworthiness or lack thereof." *State*

---

**5.** Rule 804 of Arizona's Rules of Evidence is the same as Rule 804 of the Federal Rules of Evidence. Rule 804(b)(3) reads:

*Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not ad-

missible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

**6.** Petitioner also argues that this evidence should have been admitted pursuant to Rule 804(b)(5)'s catch-all exception to the hearsay rule. However, Rule 804(b)(5) only applies if the proffered statement is not covered under any other exception. Here, the statement is covered under Rule 804(b)(3). *United States v. Thomas*, 919 F.2d 495, 498 (8th Cir.1990).

*v. LaGrand (Walter)*, 153 Ariz. at 28 n. 3, 734 P.2d at 570 n. 3. The Court then applied this test, comparing Karl LaGrand's confessions to other evidence in the record corroborating and contradicting the statements, determined that a reasonable person could not conclude that his statements could be true, and so upheld the trial court's exclusion of the statements. The overwhelming quantum of evidence against both Karl and Walter LaGrand is detailed in *State v. LaGrand (Walter), supra,* and is supplemented by this order. That evidence included eyewitness testimony describing the joint assault upon Ken Hartsock. The eyewitness, who was a bank employee held captive by Karl and Walter LaGrand, described Karl LaGrand holding Mr. Hartsock from behind while Walter LaGrand assaulted him from the front. All of Ken Hartsock's twenty-four stab wounds were frontal, despite the fact his hands were taped behind his back. It is virtually inconceivable that wounds of this nature and location would have occurred without someone or something holding him in place. In this regard, during the sentencing hearing, the prosecutor argued:

> And I would like the Court to ... review the evidence showing the number of wounds that Ken Hartsock had and the location of the wounds on Ken Hartsock's body.... [N]ote how they're all located on the front, around the throat and down the frontal chest.... And think what a person is going to do, particularly a person who's being attacked by one individual when one individual begins to stab them. Are they going to be wounded in such a way throughout 26 wounds that the wounds are all frontal? Are they going to protect themselves? Are they going to turn, as Dawn Lopez did?
>
> ... The position of Ken Hartsock's body and the location of the wounds on his body are exactly in conformity with the way in which Dawn Lopez said he was attacked, one person holding him from behind and another person stabbing him.

■ Petitioner Walter LaGrand contests the constitutionality of this rule of evidence. He argues that in excluding the hearsay confessions, the Arizona courts have prevent-

ed him from being able to present a complete defense, thereby violating his right to due process. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). It is true that state rules of evidence can sweep too broadly in excluding evidence that would otherwise appear trustworthy and thus deprive an accused of his right of due process. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (rule prohibiting a co-defendant from testifying on behalf of accused unconstitutional); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("vouching" rule preventing an accused from impeaching his own witness, when combined with rule preventing admissibility of hearsay declarations made against penal interest, unconstitutional); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (rule preventing admissibility of hearsay declarations made against penal interest at sentencing phase of trial where state had relied on same hearsay declaration in convicting co-defendant, unconstitutional); *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (rule, unique in nation, preventing an accused from offering evidence that would allow a jury to disbelieve his confession, on the grounds that the judge had already determined the confession to be voluntary, unconstitutional).

■ Petitioner suggests that this line of cases stands for the broad proposition that any state rule of evidence excluding evidence offered by an accused is subject to intense constitutional scrutiny. The law is otherwise. First, the Court is impressed with the very narrow language used in those cases. *Chambers*, 410 U.S. at 303, 93 S.Ct. at 1049 ("under the facts and circumstances of this case"); *Green*, 442 U.S. at 97, 99 S.Ct. at 2151 ("In these unique circumstances"); *Crane*, 476 U.S. at 690, 106 S.Ct. at 2147 ("In the absence of any valid state justification"). Second, the Due Process Clause has limited applicability to state rules of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) ("The Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.")

Lastly, Petitioner's evidence was excluded here not due to any broad, mechanistically-applied rule, but rather because it was deemed so unreliable as to prevent a reasonable person from possibly believing it. *State v. LaGrand (Walter)*, 153 Ariz. at 29, 734 P.2d at 571. This rationale clearly distinguishes this case from those cited by Petitioner. *Crane*, 476 U.S. at 690, 106 S.Ct. at 2146 ("we have never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted"). Therefore, even though the Arizona Supreme Court's newly-announced test interpreting Rule 804(b)(3)'s requirement of reliability may differ from those employed by other states, and some federal circuits, the Court concludes that it is not constitutionally defective.

Next, Petitioner argues that the Arizona Supreme Court misapplied its own rule. In this argument, Petitioner misunderstands the role of a federal court conducting habeas review. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67, 112 S.Ct. at 480. Here, Petitioner argues that the Arizona Supreme Court should have looked more deeply at the record and found other areas of corroboration that supported the reliability of the confessions. Respondents point out that there were also further areas of contradiction not taken into account in the Arizona Supreme Court's calculus. Yet, it is not the province of this Court to re-weigh the corroborating and contradicting factors and impose its analysis on the state courts. *Id.* It is enough that the Arizona Supreme Court's weighing and balancing was rational and not arbitrary. Having determined that the rule itself does not violate the Due Process Clause of the Constitution and that the Arizona Supreme Court rationally applied the rule, this Court's inquiry is at an end.

### Lesser included offense instruction

Petitioner contests the constitutionality of Arizona's felony murder statute, A.R.S. § 13–1105(A)(2), which has no lesser included offense. Petitioner concedes that this claim was decided adversely to him by *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), but that as *Schad* was decided 5–4, he is raising this issue now in order to preserve it. On the authority of *Schad*, the Court will deny this claim.

### *Mitigating evidence not considered by sentencing court*

■ Petitioner argues that the sentencing court failed to adequately consider that he was not primarily responsible for the murder. He claims that it was error for the court to have ruled Karl LaGrand's confession unreliable, and then not to have considered it for sentencing purposes. For the reasons stated above, the Court does not agree with Petitioner that the court committed error when it excluded the confessions. Nor does the Court agree that the court did not consider it at sentencing.

At the aggravation hearing, the prosecutor argued that the court, as sentencer, needed to make a factual finding in order to pass sentence on Petitioner. Either the murder occurred the way eyewitness Dawn Lopez said it did, with both Petitioners personally involved, or it occurred the way Karl LaGrand said it did in his confessions, with Karl LaGrand being the lone perpetrator. The trial court was persuaded, beyond a reasonable doubt, that the crime was premeditated and that both Karl and Walter LaGrand were personally involved. Petitioner's argument was considered, but was rejected. This Court will not overturn that finding on collateral review absent a showing of manifest error, which Petitioner has not done.

### CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that all of Petitioners' claims preserved for review on the merits **ARE DENIED WITH PREJUDICE**, with the exception of the issue of the

constitutionality of lethal injection as a method of execution.