Karl Hinze LaGRAND, Petitioner–Appellant,

v.

Terry STEWART,* Director, Arizona Department of Corrections, Respondent–Appellee.

Walter Burnhart LaGRAND, Petitioner–Appellant,

v.

Terry STEWART,* Director, Arizona Department of Corrections, Respondent–Appellee.

Nos. 95–99010, 95–99011.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 22, 1996.

Decided Jan. 16, 1998.

* Terry Stewart is substituted for Samuel A. Lewis, his predecessor, as Director, Arizona Department of Corrections, pursuant to Fed. R.App. P. 43(c).

Carla G. Ryan, Tucson, Arizona, and Lawrence B. Weeks, Coolidge, Arizona, for petitioner-appellant Karl Hinze LaGrand.

Bruce A. Burke, Tucson, Arizona, for petitioner-appellant Walter LaGrand.

Paul J. McMurdie, Deputy Attorney General, Phoenix, Arizona, for respondents-appellees.

Before: HUG, Chief Judge, and PREGERSON and T.G. NELSON, Circuit Judges.

Opinion by Judge T.G. NELSON; Dissent by Judge PREGERSON.

T.G. NELSON, Circuit Judge:

Arizona death row inmates Walter and Karl LaGrand appeal the district court's denial of their petitions for writ of habeas corpus. We have jurisdiction of these consolidated appeals pursuant to 28 U.S.C. § 1291, and we affirm.

## I

## FACTS AND PROCEDURAL HISTORY

Walter LaGrand (Walter) and Karl LaGrand (Karl) (collectively "the LaGrands") were each convicted of first-degree murder, attempted murder in the first degree, attempted armed robbery and two counts of kidnapping. The Arizona Supreme Court gave this account of the crimes in Walter's appeal:

> This case arises from a series of events which occurred during a bungled attempt to rob the Valley National Bank in Marana, Arizona, on January 7, 1982. That morning Walter and Karl LaGrand drove from Tucson, where they lived, to Marana intending to rob the bank. They arrived in Marana sometime before 8:00 a.m. Because the bank was closed and empty the LaGrands drove around Marana to pass time. They eventually drove to the El Taco restaurant adjacent to the bank.

Ronald Schunk, manager of El Taco, testified that he arrived at work at 7:50 a.m. The moment he arrived, a car with two men inside drove up to the El Taco. Schunk described the car as white with a chocolate-colored top. The car's driver, identified by Schunk as Walter LaGrand, asked Schunk when the El Taco opened. Schunk replied, "Nine o'clock." The LaGrands then left.

Dawn Lopez arrived for work at the bank at approximately 8:00 a.m. When she arrived at the bank she noticed three vehicles parked in the parking lot: a motor home; a truck belonging to the bank manager, Ken Hartsock; and a car which she did not recognize but which she described as white or off-white with a brown top. Because Lopez believed that Hartsock might be conducting business and desire some privacy she left the parking lot and drove around Marana for several minutes. She returned to the bank and noticed Hartsock standing by the bank door with another man whom she did not recognize. Lopez parked her car and walked toward the bank entrance where Hartsock was standing. As she passed the LaGrands' car Walter emerged from the car and asked her what time the bank opened. Lopez replied, "Ten o'clock." Lopez continued walking and went into the bank. When she entered the bank she saw Hartsock standing by the vault with Karl LaGrand. Karl was wearing a coat and tie and carrying a briefcase. Karl told her to sit down and opened his jacket to reveal a gun, which was later found by the police to be a toy pistol. Walter then came through the bank entrance and stood by the vault. Lopez testified that Walter then said, "If you can't open it this time, let's just waste them and leave." Hartsock was unable to open the vault because he had only one-half of the vault combination.

The LaGrands then moved Lopez and Hartsock into Hartsock's office where they bound their victims' hands together with black electrical tape. Walter accused Hartsock of lying and put a letter opener to his throat, threatening to kill him if he was not telling the truth. Lopez and Hartsock then were gagged with bandannas.

Wilma Rogers, another bank employee, had arrived at the bank at approximately 8:10 a.m. Upon arriving Rogers noticed two strange vehicles in the parking lot and, fearing that something might be amiss, wrote down the license plate numbers of the two unknown vehicles. She then went to a nearby grocery store and telephoned the bank. Lopez answered the phone after her gag was removed; her hands remained tied. Karl held the receiver to Lopez' ear and listened to the conversation. Lopez answered the phone. Rogers asked for Hartsock but Lopez denied that he was there, which struck Rogers as odd because she had seen his truck in the bank parking lot. Rogers then told Lopez that her car headlights were still on, as indeed they were. Rogers told Lopez that if she did not go out to turn her headlights off, then she would call the sheriff. A few minutes later Rogers asked someone else to call the bank and they also were told that Hartsock was not there. Rogers then called the town marshal's office.

After the first telephone call the LaGrands decided to have Lopez turn off her headlights. Her hands were freed and she was told to go turn off the lights but was warned that "If you try to go-if you try to leave, we'll just shoot him and leave. We're just going to kill him and leave." Lopez went to her car and turned off the lights. Upon her return to the bank her hands were retied. Hartsock was still bound and gagged in the same chair. Lopez was seated in a chair, and turned toward a corner of the room. Lopez testified that soon thereafter she heard sounds of a struggle. Fearing that Hartsock was being hurt, Lopez stood up, broke the tape around her hands and turned to help him. Lopez testified that for a few seconds she saw Hartsock struggling with two men. Karl was behind Hartsock holding him by the shoulders while Walter was in front. According to Lopez, Walter then came toward her and began stabbing her. Lopez fell to the floor, where she could see only the scuffling of feet and Hartsock lying face down on the floor. She then heard someone twice say, "Just make sure he's dead."

.

The LaGrands left the bank and returned to Tucson. Lopez was able to call for help. When law enforcement and medical personnel arrived at the bank Hartsock was dead. He had been stabbed 24 times. Lopez, who had also been stabbed multiple times, was taken to University Hospital in Tucson.

Law enforcement personnel quickly identified the LaGrands as suspects. By 3:15 p.m., police had traced the license plate number to a white and brown vehicle owned by the father of Walter's girl friend, Karen Libby. The apartment where the LaGrands were staying with Karen Libby was placed under surveillance. Shortly thereafter Walter, Karl and Karen Libby left the apartment and began driving. They were followed and soon pulled over. Walter and Karl were then arrested and the car was searched. Karen Libby's apartment was also searched and a steak knife similar to one found at the bank was seized. Karl's fingerprint was found at the bank. A briefcase containing a toy gun, black electrical tape, a red bandanna, and other objects was found beneath a desert bush and turned over to the police.

*State v. LaGrand,* 153 Ariz. 21, 734 P.2d 563, 565–66 (1987).

When questioned after their apprehension, Walter made no statements, but Karl confessed to the crimes in two different statements. He stated that he had stabbed Hartsock and Lopez, but that Walter had not stabbed anyone and that Walter had been out of the room at the time. Following a jury trial, both were convicted on all charges. After considering mitigating and aggravating circumstances,[1] the judge sentenced both defendants to death. The Arizona Supreme Court affirmed the convictions and sentences. *State v. Karl LaGrand,* 152 Ariz. 483, 733 P.2d 1066 (1987); *State v. Walter LaGrand, supra.* The Supreme Court of the United States denied certiorari. 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

The LaGrands then filed post-conviction relief petitions in the Arizona Superior Court (trial court) which were denied in 1989. The Arizona Supreme Court denied review as did the United States Supreme Court. 501 U.S. 1259, 111 S.Ct. 2910, 2911, 115 L.Ed.2d 1074 (1991). The LaGrands then filed petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court, in a series of orders, denied relief, *LaGrand v. Lewis,* 883 F.Supp. 469 (D.Ariz.1995), *LaGrand v. Lewis,* 883 F.Supp. 451 (D.Ariz.1995), and these timely appeals followed.

Additional facts necessary to the discussion of the several issues are contained in the portions of this opinion in which the issues are addressed.

## II

### JOINT ISSUES

Walter and Karl raise a number of issues jointly, which we discuss prior to reaching their individual claims.

#### A. *The Pecuniary Gain Factor*

■ Two related arguments are advanced relative to the trial court's finding of expectation of pecuniary gain as an aggravating factor. *First,* the LaGrands contend that the finding of pecuniary gain was arbitrary or irrational. The trial court's finding was affirmed by the Arizona Supreme Court in its independent review. That court said:

We do not believe the defendant must intend beforehand to kill as well as to rob to satisfy the statute. A.R.S. § 13–703(F)(5). Nor do we believe that an absence of actual receipt of money or valuables negates a finding of expectation of pecuniary gain as an aggravating circumstance.

In this case, the attempted robbery permeated the entire conduct of the defendant. The defendant may have reacted irrationally to the failure or inability of the

---

1. The court found that the following aggravating circumstances were proven beyond a reasonable doubt: prior conviction of a felony involving the use or threat of violence on another person, expectation of pecuniary gain, and commission of the crime in an especially heinous, cruel or depraved manner. *State v. Walter LaGrand,* 153 Ariz. at 34–36, 734 P.2d at 576–77; *State v. Karl LaGrand,* 152 Ariz. 483, 488–89, 733 P.2d 1066, 1072 (1987). The court considered three mitigating factors: defendants' ages (18 and 19), their prior home lives, and their remorse. *Id.*

victim to open the safe but the murder was neither accidental nor unexpected. The reason defendant was there was his expectation of pecuniary gain and the reason he stabbed the victim was because the victim was unable to open the safe, frustrating defendant's continuing attempt for pecuniary gain. The defendant's goal of pecuniary gain caused the murder and the murder was in furtherance of his goal. We agree with the trial court's finding that the defendant's expectation of pecuniary gain was an aggravating factor.

*State v. LaGrand*, 153 Ariz. at 36, 734 P.2d at 578 (footnote omitted).

*Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990), a case arising in Arizona, held that federal court review of such a finding by the state court "is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." The Court went on to say:

> A state court's finding of an aggravating circumstance in a particular case-including a de novo finding by an appellate court that a particular offense is "especially heinous ... or depraved"-is arbitrary or capricious if and only if no reasonable sentencer could have so concluded.

*Id.* at 783, 110 S.Ct. at 3103.

Here, the sole purpose of the journey to the bank was to rob it. The LaGrands threatened the victims with death in order to obtain entry to the vault. In fact, Walter LaGrand admitted in his trial testimony that he held a letter opener to Ken Hartsock's neck as a threat. A rational sentencer could have found the existence of the pecuniary gain aggravating factor.

■ *Second,* the LaGrands argue that the Arizona Supreme Court broadened the definition of pecuniary gain in violation of both the Due Process Clause and the Ex Post Facto Clause of the Constitution. Their basic argument is that the Arizona Supreme Court, in saying that the intent to rob "infects" all other actions, "effectively wipes out any requirement to prove the aggravating factor beyond a reasonable doubt."

The Ex Post Facto Clause does not apply to court decisions construing statutes. "The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, *see Calder v. Bull,* 3 Dall. [U.S.] 386, 1 L.Ed. 648 (1798), and does not of its own force apply to the Judicial Branch of government." *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977).

It is the Due Process Clause, rather than the Ex Post Facto Clause, which protects criminal defendants against novel developments in judicial doctrine. *See, e.g., Bouie v. Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). *See also United States v. Ruiz,* 935 F.2d 1033, 1035 (9th Cir.1991). However, an unforeseeable judicial construction of a statute may run afoul of the Due Process Clause because of the same policy underlying the Ex Post Facto Clause-lack of "fair warning of that conduct which will give rise to criminal penalties." *Marks,* 430 U.S. at 191, 97 S.Ct. at 992–93.

The Arizona statutory scheme was clear in 1982. The felony murder statute provided that robbery or attempted robbery were predicate felonies, and that the statute applied if, "in the course of and in furtherance of such offense or immediate flight from such offense, [the defendant] causes the death of any person." A.R.S. § 13–1105(A)(2). The capital punishment statute provided that defendant's expectation of the receipt of something of pecuniary value was an aggravating factor. A.R.S. § 13–703(F)(5). So, unless the Arizona Supreme Court had narrowed the clear terms of the statutes to a robber's benefit prior to the LaGrands' commission of the murder, there was no due process violation.

The cases cited by the LaGrands do not support the result they seek. Two of them, *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825 (*in banc*), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980), and *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105 (*in banc*), *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983), did not involve reliance on the pecuniary gain factor.

Nor do the other cases cited support their argument. *State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (*in banc*), involved murders committed in order to insure that no one be left to identify the rob-

bers ("The only motivation for the killings was to leave no witnesses to the robbery."). *State v. Hensley,* 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984) (*in banc*), was much the same ("In this case, the murders were a part of the overall scheme of the robbery with the specific purpose to facilitate the robbers' escape."). There is language in *Hensley* from an earlier case indicating that "an unexpected or accidental death that was not in furtherance of the defendant's goal of pecuniary gain" would not support a finding of the aggravating circumstance. *Id.* 142 Ariz. at 603, 691 P.2d at 694 (quoting *State v. Harding,* 137 Ariz. 278, 296, 670 P.2d 383, 401 (1983) (Gordon, J., concurring), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984)).[2]

The LaGrands' argument seems to be premised on their claim that the killing was not in furtherance of the robbery, but rather came about when Ken Hartsock kicked Karl during a struggle, and Karl impulsively reacted by stabbing him. However, this argument is contrary to Dawn Lopez's testimony that she saw both men involved in a struggle with Ken Hartsock and her testimony that she twice heard at least one of them say "make sure he's dead." Ms. Lopez's evidence is consistent with a murder committed in order to eliminate witnesses. The LaGrands' argument is also contrary to the *Enmund*[3] finding of the district court: "The court finds beyond a reasonable doubt that both defendants participated in the actual killing of Mr. Hartsock and that both defendants intended to kill him."

The Arizona Supreme Court's decisions in the *LaGrand* cases were not an unforeseeable departure from its existing jurisprudence, and no due process violation occurred. *Poland v. Stewart,* 117 F.3d 1094, 1098–1100 (9th Cir.1997).

## B. *Consular Notification*

The LaGrands contend that, as German nationals, they were entitled to contact the German consulate upon being arrested and that the Arizona authorities' failure to inform them of this right violated their constitutional rights. The *Vienna Convention on Consular Relations of 1963,* Article 36, TIAS 6820, 21 U.S.T. 77,596 UNTS 261 (Ratified by United States Senate on December 24, 1969) ("The Treaty"), requires the receiving state (here, the United States) to allow nationals of the sending state (here, Germany) to notify their national consulate after they are arrested. The authorities of the receiving state are required to inform the arrested foreign national "without delay of his rights under this sub-paragraph." *Id.*

It is undisputed that the State of Arizona did not notify the LaGrands of their rights under the Treaty. It is also undisputed that this claim was not raised in any state proceeding. The claim is thus procedurally defaulted.

We may address the merits of a procedurally defaulted claim if the petitioner can show cause for the procedural default and actual prejudice as a result of the alleged violations of federal law. *Bonin v. Calderon,* 77 F.3d 1155, 1158 (9th Cir.), *cert. denied,* 516 U.S. 1143, 116 S.Ct. 980, 133 L.Ed.2d 899 (1996). To demonstrate cause, the petitioner must show the existence of "some objective factor external to the defense [which] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986); *see also McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 1471–72, 113 L.Ed.2d 517, *reh'g denied,* 501 U.S. 1224, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991) (cause is external impediment such as government interference or reasonable unavailability of claim's factual basis). Lacking cause and prejudice, we may nonetheless consider procedurally barred claims if failure to do so would result in the conviction or execution of " 'one who is actually innocent.' " *Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 864, 130 L.Ed.2d 808 (1995).

---

**2.** The LaGrands base most of their arguments here on cases decided *after* the crime was committed. Those cases would obviously not support their argument that the LaGrands lacked notice of the extent of the statute's reach at the time of the crime.

**3.** *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

■ As to cause, the LaGrands argue ineffective assistance of counsel. In Karl's case, he was represented by one lawyer at trial, a second lawyer on appeal, a third lawyer in his state post-conviction relief (PCR) proceeding and present counsel on his federal habeas. Karl has offered no support for his argument that something external to the defense prevented his lawyer from presenting this claim to the state courts, except ineffective assistance of *trial* counsel. He has not, however, argued, let alone shown, that any external factor prevented his counsel in the state PCR proceeding from presenting this claim. He has therefore not shown cause.

Walter, who has had the same lawyer throughout, signed a waiver of his right to present ineffective assistance of counsel claims. We will discuss this waiver in more detail when we reach Walter's individual claims. The waiver is sufficient to preclude using his lawyer's ineffective assistance as cause for failing to present this claim to the state courts. Thus, the LaGrands have failed to demonstrate cause for their procedural defaults in state court.

The LaGrands argue that they meet the fundamental miscarriage of justice standard since they are actually innocent of the death penalty. Their basic argument is that the failure to notify them of their right to contact the German consulate "effectively blocked LaGrands' ability to gather exculpatory or mitigating evidence." The Supreme Court has stated, however, that actual innocence of the death penalty must focus on eligibility for the death penalty, and not on additional mitigation. *Sawyer v. Whitley,* 505 U.S. 333, 345–46, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992).

The evidence the LaGrands contend they were blocked from obtaining relates to background information concerning their abusive childhoods in Germany and the difficulties that children of mixed marriages encountered in Germany. While this evidence could have related to mitigation, it has no demonstrable connection to the findings of pecuniary gain or that the murder was committed in an especially cruel, heinous or depraved manner. Because the postulated evidence does not go to eligibility for the death penalty, the LaGrands do not substantiate their claim of actual innocence.

C. *The Constitutionality of Arizona's Felony Murder Statute*

■ The LaGrands requested a second-degree murder instruction as a lesser-included offense to the felony murder charge. The trial court denied the request as Arizona felony murder law does not include any lesser-included offenses. *State v. LaGrand,* 153 Ariz. at 30–31, 734 P.2d at 572–73. The LaGrands challenge the court's refusal to give the lesser-included instruction on the basis that the ruling was contrary to the teaching of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and thus violated the Constitution.

In *Beck,* the Supreme Court considered a unique Alabama statute under which the jury was given only a choice of conviction of capital murder or acquittal. The Supreme Court reversed Beck's conviction on the basis that the limited choices available to the jury impermissibly enhanced "the risk of an unwarranted conviction." *Id.* at 637, 100 S.Ct. at 2389. "The goal of the *Beck* rule ... is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Schad v. Arizona,* 501 U.S. 624, 646–47, 111 S.Ct. 2491, 2505, 115 L.Ed.2d 555 (1991).

In the instant case, however, the all-or-nothing scenario condemned in *Beck* did not exist. As to the charge of murder in count one, the jury was told it could return verdicts of guilty of murder in the first degree, murder in the second degree or not guilty. The LaGrands were charged with first-degree murder. The jury was told that the crime could be committed as a felony murder or as premeditated murder. An instruction on second-degree murder was given, as was a possible verdict of second-degree murder as to Count One. The jury was not specifically told that second-degree murder was not a lesser-included offense to felony murder, although a close reading of the instructions could have led the jury to that conclusion.

The jury was also given the choice of convicting or acquitting the defendants of attempted first-degree murder, attempted second-degree murder, aggravated assault, armed robbery, robbery and kidnapping in

the other counts. In the event the jury had found itself unable to agree on a conviction of first-degree murder, it would not have had to face the choice of simply acquitting the LaGrands.

Thus, the instructions in the instant case do not implicate the concerns of the *Beck* doctrine because the LaGrands' jury was not faced with the "all or nothing" choice presented in *Beck. See Schad,* 501 U.S. at 646–47, 111 S.Ct. at 2505 (no *Beck* error where instruction does not present jury with "all-or-nothing choice between the offense of conviction (capital murder) and innocence") (quotations omitted).

### D. *Inadequate Weighing by the State Courts*

The LaGrands argue that the state courts did not adequately consider the mitigation evidence presented at the sentencing. They rely on the panel opinion in *Jeffers v. Lewis,* 974 F.2d 1075, 1079 (9th Cir.1992): "[when] there is a risk that mitigating evidence in [a] case was not *fully* considered, [Petitioner's] sentence of death cannot stand."

However, this court took the *Jeffers* case *en banc,* and affirmed the district court's denial of the petition. *Jeffers v. Lewis,* 38 F.3d 411 (9th Cir.1994), *cert. denied,* 514 U.S. 1071, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995). There we said, quoting *Jeffries v. Blodgett,* 5 F.3d 1180, 1197 (9th Cir.1993), *cert. denied,* 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994): "[D]ue process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant." *Jeffers,* 38 F.3d at 418.

■ The LaGrands do not argue that the state courts refused to consider any of their proffered mitigating evidence. They argue that the mitigating circumstances were not considered "fully." However, the federal courts do not review the imposition of the sentence *de novo.* Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational factfinder test of *Lewis v. Jeffers.* That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have

imposed the death penalty? The answer is "yes."

■ The aggravating circumstances of pecuniary gain, a murder committed in an especially heinous, cruel or depraved manner and prior conviction of a felony involving the use or threat of violence were well supported in the record. While there were mitigating factors, such as the LaGrands' ages (Walter was 19; Karl, 18), their prior home life and their remorse, a rational sentencer could have nevertheless imposed the death penalty.

### E. *District Court's Upholding of Death Penalty*

The LaGrands argue that the death penalty should not have been upheld by the district court. They point out that the Supreme Court has said that "the death penalty can be upheld in only the most egregious cases," citing *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), and that the death penalty "is reserved for truly exceptional cases," citing *State v. Bible,* 175 Ariz. 549, 606, 858 P.2d 1152, 1209 (1993). They argue that this case does not come within the "truly exceptional" category.

■ The LaGrands in effect ask us to review the Arizona Supreme Court's determination that the imposition of the death penalty in their case was not disproportionate to the penalty imposed in similar cases. *See State v. Walter LaGrand,* 153 Ariz. at 37, 734 P.2d at 579; *State v. Karl LaGrand,* 152 Ariz. at 488–90, 733 P.2d at 1072–73. However, once the Arizona Supreme Court "undertook its proportionality review in good faith and found that [the LaGrands'] sentence was proportional to the sentences imposed" in similar cases, "[t]he Constitution does not require [the federal habeas court] to look behind that conclusion." *Lewis v. Jeffers,* 497 U.S. 764, 779, 110 S.Ct. 3092, 3101, 111 L.Ed.2d 606 (1990) (quoting *Walton v. Arizona,* 497 U.S. 639, 655–56, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990)). There is no indication that the Arizona Supreme Court's proportionality review was conducted in bad faith. The LaGrands' proportionality claim therefore fails.

The LaGrands also contend that the state courts and the federal district court improperly "assumed" the existence of the aggravating factor of "cruel, heinous or depraved," rather than finding its existence beyond a reasonable doubt. However, the state courts did indeed premise their finding of "cruel, heinous or depraved" upon specific evidence of Hartsock's physical and mental suffering, the LaGrands' infliction of gratuitous violence upon and mutilation of Hartsock, and Hartsock's position of helplessness. *See State v. Walter LaGrand,* 153 Ariz. at 36–37, 734 P.2d at 578–79. The state trial court found that this aggravating circumstance had been established beyond a reasonable doubt. *See id.* at 34, 734 P.2d at 576. Accordingly, this claim also fails.

F. *Lethal Gas as a Method of Execution*

In Arizona, all condemned prisoners will be executed by means of lethal injection unless those who were sentenced before the Arizona legislature adopted lethal injection affirmatively choose lethal gas as the method to be used in their cases. A.R.S. § 13–704(B). The LaGrands come within the group having this option under state law. Thus, they would be executed by lethal gas only if they affirmatively choose to do so.

The court held in *Poland v. Stewart,* 117 F.3d 1094, 1104 (9th Cir.1997), that Poland's claim that lethal gas was an unconstitutional method of execution was not ripe. For the same reasons, the LaGrands' claim is not ripe and cannot be considered. *Id.*

G. *Lethal Injection as a Method of Execution*

The LaGrands also contend that lethal injection is an unconstitutional method of execution.[4] In support of this claim, they submitted the reports of eyewitnesses to two Arizona executions using lethal injection. One report, published in the *Arizona Republic* on March 3, 1993, said that John George Brewer "was pronounced dead at 12:18 a.m., one minute after he received a combination

of three drugs injected through a pair of intravenous tubes."

A report of the execution of James Dean Clark was published in the same paper on April 15, 1993, but with a different by-line. The report said:

Then as three lethal drugs surged into his veins at 12:05 a.m., Clark's chest heaved several times, and his skin turned ashen.... Because it didn't look like he simply was going to sleep, Clark's execution was much more gruesome, intense, bizarre and dramatic than I had anticipated. But it was also much easier to watch than I expected, because Clark didn't appear to suffer nearly as much as Don Eugene Harding, who died in the gas chamber last April.

The LaGrands also submitted an affidavit from an observer of the lethal *gas* execution of Don Harding:

Don Harding took ten minutes and thirty-one seconds to die. At least eight of those minutes were spent in gross and brutal agony.... Then I will never forget the look on his face when he turned to me several seconds after first having inhaled the fumes. It is an image of atrocity that will haunt me for the rest of my life. Don Harding's death was slow, painful, degrading and inhumane.... He literally choked and convulsed to death in front of my eyes.

In addition to the reports mentioned above, the LaGrands submitted the affidavit of one Michael L. Radelet, prepared for a separate capital case in Arizona. Radelet, a sociologist who collected reports of "botched" executions, described what happened in nine executions by lethal injection. They involved either problems in finding a suitable vein or violent reactions to the drugs. None took place in Arizona and none were tied to the protocol used in Arizona.

The LaGrands also submitted the affidavit of a doctor on the staff of the College of Medicine at the University of Arizona who reviewed the procedures established for the

4. For purposes of this opinion, we will assume that such a challenge is properly brought in a Section 2254 action. While the claim is procedurally barred by failure to raise it in state court, we will examine the merits of the claim to deter-

mine if the LaGrands could meet the prejudice prong of the cause and prejudice standard of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

administration of lethal injection in Arizona. Apparently he did not witness either of the two executions in Arizona by lethal injection. His ultimate conclusion was that the procedures were flawed, but his affidavit is replete with speculation. For example, he states at some length the possible consequences of administering the designated drugs in the wrong sequence. While he states that there may be some risk of this, the two Arizona executions recounted in the other materials show no such problems in actual practice. *See Campbell v. Wood,* 18 F.3d 662, 668 (9th Cir.) ("The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review."), *cert. denied,* 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).

The LaGrands' challenge is similar to that rejected in *Poland,* 117 F.3d at 1104–05, and the district court did not err in rejecting their challenge to Arizona's use of lethal injection as a method of execution.

### III

### WALTER'S INDIVIDUAL CLAIMS

#### A. *The Exclusion of Karl's Confession*

■ Karl made two separate recorded statements in the late hours of January 7 and early hours of January 8. In those statements he assumed sole responsibility for the attack on Ken Hartsock, saying it occurred after Mr. Hartsock kicked him in the leg. He said that Walter did not stab anyone and that Walter was not in the room when he stabbed Mr. Hartsock and Ms. Lopez.

Pursuant to the stipulation of the parties, the trial court ruled that the confessions were voluntary but that they were taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This precluded the State from introducing the confessions as evidence in the guilt phase of the trial against Karl. The *Miranda* stipulation did not, however, preclude Walter from introducing the confessions as part of his defense. Walter thus sought to have the confessions introduced under Arizona Rule of Evidence 804(b)(3), which is identical to Federal Rule of Evidence 804(b)(3). The rule provides as follows:

Rule 804. Hearsay Exceptions; Declarant Unavailable

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(b)(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

153 Ariz. at 26–27, 734 P.2d at 568–69 (quoting A.R.S. Rule of Evid. 804(b)(3)). After considering Walter's request on four separate occasions, the trial court held the confessions were inadmissible at the guilt phase of the trial.

■ On appeal from the LaGrands' convictions, the Arizona Supreme Court explained the proper method of determining admissibility under Rule 804(b)(3):

We therefore hold that a judge's inquiry, made to assure himself that the corroboration requirement of Rule 804(b)(3) has been satisfied, should be limited to asking whether evidence in the record corroborating and contradicting the declarant's statement would permit a reasonable person to believe that the statement could be true. If a judge believes that a reasonable person could [so] conclude ... then the judge must admit the statement into evidence.

*State v. Walter LaGrand,* 153 Ariz. at 36, 734 P.2d at 570.

Applying this standard, the Arizona Supreme Court concluded that the trial court's refusal to admit the statements was not in error:

Evidence both corroborating and contradicting Karl's statements exists. The following evidence corroborated Karl's statements: Karl did have a bruise on his leg as he stated; Lopez testified that she saw Hartsock kick someone; Lopez testified that only one person stabbed her; and

Walter testified that he was out of the room when the stabbings occurred. The following evidence contradicted Karl's statements: Lopez testified that she saw Hartsock struggling with two men; Lopez testified that she was "positive" that Walter had stabbed her; Lopez testified that after being stabbed by Walter and falling to the floor one brother said to the other twice, "Just make sure he's dead"; and the forensic consultant who performed an autopsy on Hartsock testified that more than one instrument was used to inflict Hartsock's wounds.

After reviewing the above corroborating and contradicting evidence, we do not think that a reasonable person could conclude from the same corroborating and contradictory evidence that Karl's exculpatory statements could be true. The trial judge properly denied admission of Karl's statements.

*Id.* 153 Ariz. at 29, 734 P.2d at 571.

Walter's argument here is that exclusion of the confessions violated his Sixth Amendment right to "present a complete defense" to the charges against him. *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). He relies on "the *Chambers* doctrine" derived from *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Chambers was convicted of killing a policeman in a small town in Mississippi. Gable McDonald had confessed to killing the officer in a statement to Chambers' lawyer, but he later repudiated the confession.

At trial, Chambers attempted to show he did not shoot the officer. He also tried to show that McDonald was the shooter. The trial court would not permit Chambers to introduce the testimony of three witnesses to whom McDonald had admitted shooting the officer on the grounds that the proffered testimony was hearsay. Mississippi recognized statements against pecuniary interest, but not statements against penal interest, as an exception to the hearsay rule.

The Court reversed Chambers' conviction, saying:

> The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049.

*Chambers* is but one of several Supreme Court decisions dealing with state rules of evidence used to reject a defendant's evidence on "mechanistic" grounds. In *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the Court again reversed a conviction where the Georgia courts had rejected hearsay statements on the ground that Georgia did not recognize the penal interest exception to the hearsay rule.

An earlier case, *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), involved Texas statutes which prohibited persons charged or convicted as co-participants in a crime from testifying for each other, though they could testify for the State. Washington's proffer of testimony tended to show that Washington was not the shooter. The evidence was rejected pursuant to the Texas statutes. The Supreme Court reversed the conviction on the grounds that the State's rule "arbitrarily" deprived Washington of his right under the Sixth Amendment to present witnesses in his defense.

In the more recent case of *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Court held that a state could not "arbitrarily or disproportionately" prevent a defendant from testifying in her defense by implementing a *per se* rule prohibiting hypnotically enhanced testimony.

These cases, taken together, stand for the proposition that states may not impede a defendant's right to put on a defense by imposing mechanistic (*Chambers*) or arbitrary (*Washington* and *Rock*) rules of evidence. But they do not stand for the proposition that a defendant must be allowed to put on any evidence he chooses. As the Court said in *Chambers:*

> Few rights are more fundamental than that of an accused to present witnesses in

his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.

410 U.S. at 302, 93 S.Ct. at 1049 (citations omitted). *See also Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability-even if the defendant would prefer to see the evidence admitted.").[5]

Here, Karl LaGrand's confession was not excluded as a result of rigid application of arbitrary or mechanistic rules of admissibility. Rather, the state courts determined, after analyzing the proffer and the corroborating and contradictory circumstances, that the confession was not sufficiently reliable to warrant its introduction. Thus, the refusal to admit Karl's confession did not run afoul of the *Chambers–Washington–Rock* prohibition against arbitrary and mechanistic exclusion of exculpatory evidence.

While *Chambers* clearly prohibits states from excluding exculpatory evidence by application of rigid or arbitrary exclusionary rules, it is not clear whether the *Chambers* doctrine implies a requirement of independent federal review of a state court's determination of reliability. In *Lee v. McCaughtry,* 933 F.2d 536, 538 (7th Cir.), *cert. denied,* 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991), the Seventh Circuit suggested that *Chambers* imposed no such requirement: "Once a state has brought its rules of evidence into line with constitutional norms, there is little point in case-by-case federal review of evidentiary rulings." However, the

*Lee* court specifically declined to answer the question whether federal review is required, and instead duplicated the state court's reliability inquiry and concluded that the refusal to admit the evidence was proper. *Id. See also Turpin v. Kassulke,* 26 F.3d 1392, 1397 (6th Cir.1994) (reversing district court's granting of habeas petition after reviewing the testimony excluded by the state trial court and concluding that the evidence was indeed "fundamentally untrustworthy"), *cert. denied,* 513 U.S. 1118, 115 S.Ct. 916, 130 L.Ed.2d 797 (1995).

We need not answer the question here because, even assuming that federal review is required, the Arizona Supreme Court's conclusion-that Karl's statement exculpating Walter was not sufficiently reliable to come in under Rule 804(b)(3)–finds ample support in the record and thus cannot be said to have had "substantial and injurious effect or influence in determining the jury's verdict" against Walter LaGrand. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).[6]

Karl LaGrand's confession included two separate statements: first, that he, Karl LaGrand, stabbed Ken Hartsock, and second, that Walter LaGrand did not stab anyone. Because the "statements against penal interest" exception to the hearsay rule is premised upon the inherent reliability of statements that tend to incriminate the declarant, federal courts have concluded that a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant ad-

5. *See also* the discussion in *Montana v. Egelhoff,* 518 U.S. 37, ——–——, 116 S.Ct. 2013, 2021–22, 135 L.Ed.2d 361 (1996) (plurality opinion).

6. Much of the analysis here relies upon cases in which federal appeals courts were directly reviewing the evidentiary rulings of federal trial courts, rather than collaterally reviewing state court rulings in the context of federal habeas proceedings. The court is mindful of the distinction between direct and collateral review, including the fact that direct review involves application of the abuse of discretion standard, while collateral review falls under the "substantial and

injurious effect" standard announced in *Brecht.* However, the rules and considerations that guide federal appeals courts on direct review of federal trial court rulings are nonetheless instructive, and in any event, the "abuse of discretion" standard of review is less deferential than the standard applied to state court rulings in habeas cases. *See, e.g., Engle v. Isaac,* 456 U.S. 107, 134–35, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982) ("[T]he burden of justifying federal habeas relief for state prisoners is greater than the showing required to establish plain error on direct appeal.") (internal quotations omitted).

mitted under the exception. *See Williamson v. United States*, 512 U.S. 594, 599–600, 114 S.Ct. 2431, 2434–35, 129 L.Ed.2d 476 (1994) (noting that judges in federal cases must separate the incriminatory portions of statements from other portions for purposes of Rule 804(b)(3) because "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts"); *Carson v. Peters*, 42 F.3d 384, 386 (7th Cir. 1994) ("Portions of inculpatory statements that pose no risk to the declarants are not particularly reliable; they are just garden variety hearsay."); *United States v. Porter*, 881 F.2d 878, 882–83 (10th Cir.) (if a statement exculpatory to the accused is severable from the statement inculpatory to the declarant, each statement must be separately analyzed under Rule 804(b)(3)), *cert. denied*, 493 U.S. 944, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *United States v. Lilley*, 581 F.2d 182, 188 (8th Cir.1978) ("To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded.").

In stating that Walter did not stab anyone, Karl was not further incriminating himself. The reliability that attends the inculpatory part of his confession does not afford any reliability to that part of the statement that merely exculpates Walter. Accordingly, it was not entitled to the benefit of Rule 804(b)(3)'s exception to the hearsay rule.

Further, as noted by the Arizona Supreme Court, direct evidence contradicted Karl's statement that Walter was not involved in the stabbing of Ken Hartsock: Mr. Hartsock was stabbed 24 times and all wounds were frontal; the wounds were consistent with two different instruments having been used; Ms. Lopez, the only eyewitness, testified that Walter was standing in front of Mr. Hartsock while Karl held him from behind; that at least one person said twice, "Make sure he's dead"; and that Walter stabbed her.

Finally, under federal case law, a judge ruling on the reliability of Karl's statement could consider that Walter's own testimony was not corroborative, *see Turpin*, 26 F.3d at 1397–98, and that the exculpatory statements of family members are not considered to be highly reliable, *United States v. Bobo*, 994 F.2d 524, 528 (8th Cir.), *cert. denied*, 510 U.S. 891, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993).

In light of the foregoing, we conclude that even if *Chambers* requires federal review of the state courts' determination of reliability, the Arizona courts' conclusion that the statement was not sufficiently reliable to be admitted was both "reasoned and reasonable" and, as such, did not violate Walter LaGrand's right to present a complete defense. *Carson*, 42 F.3d at 387.

Walter also argues that the standard of "clearly" indicating a statement's trustworthiness is "too onerous a burden." He argues that *Chambers* stands for the proposition that the courts can require only a "more reasonable, minimal [burden]." He relies mainly on texts and law review articles,[7] being unable to point to cases which specifically hold that Rule 804(b)(3), in either state or federal garb, runs afoul of a defendant's due process rights for that reason. This argument fails because, given the inherent unreliability of corollary exculpatory statements, Rule 804(b)(3)'s requirement that such statements be clearly corroborated is entirely legitimate and reasonable.

Walter also makes a related argument concerning the discriminatory effects of the corroboration requirement of Rule 804(b)(3). This argument springs from the Supreme Court's statement in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that the Confrontation Clause does not bar introduction of hearsay testimony which bears sufficient indicia of reliability. The Court said that reliability can be inferred without further corroboration in cases where the evidence falls within a "firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. at 2539. Otherwise, a "showing of particularized guarantees of trustworthiness [would] be required." *Id.*

---

7. *Weinstein's Evidence*, ¶ 804(b)(3)[03]. Peter W. Tague, *Perils of the Rule-making Process: The Development, Application and Unconstitutionality of Rule 804(b)(3)'s Penal Interest Exception*, 69 Geo.L.J. 851 (1981). Edward J. Imwinkelried, *The Constitutionalization of Hearsay: The Extent to Which the Fifth and Sixth Amendments Permit or Require the Liberalization of the Hearsay Rules*, 76 Minn.L.Rev. 521 (1992).

Since the state can introduce a confession without showing clear corroboration, the argument goes, the defendant should be able to do the same. This argument suffers from the same flaw as the preceding one: exculpatory statements such as Karl's do not come within a "firmly rooted hearsay exception" as do incriminating statements. *See Carson v. Peters*, 42 F.3d at 386. In limiting admissible evidence to that found to be reliable, the rule-writers may legitimately impose the burden of offering proof of clearly corroborating circumstances on those offering exculpatory hearsay statements.

Walter also argues that the state courts' rejection of Karl's confessions unconstitutionally interfered with the jury's fact-finding role. The state's contention that this claim was not raised in the district court or in state court has merit. In the district court, the argument that the trial court's ruling invaded the province of the jury was simply a subset of the contention that *Chambers* required the trial court to admit the evidence. There was not, as there is here, a stand-alone argument of interference with the jury's function. A decision on this issue is subsumed in the ruling on the "*Chambers* doctrine" and need not be separately addressed.

We conclude that there was no constitutional error in the Arizona courts' decision to exclude under Rule 804(b)(3) Karl LaGrand's statement that Walter was not involved in the stabbing of Ken Hartsock.

### B. *Mr. Burke's Request to Withdraw*

■ Walter LaGrand has been represented by Bruce Burke, a Tucson lawyer, throughout all proceedings to date. Prior to appointing him as counsel in Walter's federal habeas proceeding, the district court required Mr. Burke to discuss possible claims of ineffective assistance of counsel with Walter and then to file a status report with the court.

In the status report, Mr. Burke recounted a meeting he had had with Walter in which he had explained the issue of ineffective assistance of counsel, "and [had told him] that such a claim might provide him with an avenue for relief from the death penalty." Mr. Burke also informed Walter that he knew of no instances in which his own assistance had been ineffective. He further told Walter that the court "would appoint an additional attorney, or a new attorney, to examine my performance" if Walter desired. Walter told Mr. Burke that "he did not want me to take steps which might require me to withdraw as his attorney of record and he did not wish me to seek appointment of a new attorney to consider the issue."

After Mr. Burke was appointed in federal court, he learned that Karl's counsel was going to present evidence to the effect that his trial counsel had been ineffective at the sentencing phase of the case. Because Mr. Burke believed that this drew into question his own effectiveness at sentencing, ·he moved to withdraw as Walter's counsel.

The district court denied the motion on the grounds that Walter had been given an opportunity to change counsel in order to present an ineffective assistance of counsel claim but had waived that right. The court also held that no prejudice had been shown since the claimed failure did not constitute ineffective assistance of counsel.

We review the district court's order for abuse of discretion. *United States v. Baker*, 10 F.3d 1374 (9th Cir.1993), *cert. denied*, 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Walter's waiver was not of specific instances of ineffectiveness, but of the employment of new counsel to potentially pursue such claims.

In this instance, Walter's claim that the waiver was not effective because he didn't know the facts constituting the claim has no merit. When Walter waived the offer of new counsel, he was waiving the benefits of new representation, among which would potentially have been the presentation of this sort of new claim. *See United States v. Lowry*, 971 F.2d 55 (7th Cir.1992). Since the claim now asserted was well within the waiver, the district court did not abuse its discretion in denying the motion.

For the foregoing reasons, we affirm the district court's denial of Walter's petition.

### IV

### KARL'S INDIVIDUAL CLAIMS

#### A. *Ineffective Assistance of Counsel*

■ A claim of ineffective assistance of counsel presents a mixed question of law and

fact which we review *de novo. Sanders v. Ratelle,* 21 F.3d 1446, 1451 (9th Cir.1994) (citing *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)).

Under *Strickland,* a petitioner seeking habeas relief based on the ineffective assistance of counsel must show: (1) that the counsel's performance falls "below an objective standard of reasonableness," 466 U.S. at 688, 104 S.Ct. at 2064; and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, *id.* at 694, 104 S.Ct. at 2068.

Karl claims that the district court erred on his *Strickland* ineffectiveness claim: (1) by limiting the scope of the evidentiary hearing; and (2) by finding that Karl's trial counsel's performance did not fall below an objective standard of reasonableness.

### 1. *Scope of Evidentiary Hearing*

 In a capital case, a petitioner is entitled to an evidentiary hearing where there has been no state court evidentiary hearing and the petitioner raises a "colorable" claim of ineffective assistance. *Smith v. McCormick,* 914 F.2d 1153, 1170 (9th Cir. 1990). The scope of an evidentiary hearing on a motion under 28 U.S.C. § 2254 is committed to the discretion of the district court. *United States v. Layton,* 855 F.2d 1388, 1421 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

In the present case, the district court held an evidentiary hearing on Karl's ineffective assistance of counsel claim for the limited purpose of determining whether Karl could establish the first prong of the *Strickland* test. Karl was therefore required to prove that his counsel's performance was deficient before the court would entertain evidence regarding prejudice.

 Karl argues that the district court's limitation on the scope of the evidentiary

hearing was erroneous for two reasons. *First,* Karl claims that the two prongs of the *Strickland* test are interconnected and that they must be considered together.

No court has ever held that both prongs of the *Strickland* test must be examined simultaneously. To the contrary, the Supreme Court has held that a court is not required to address both components of the *Strickland* test in deciding an ineffective assistance of counsel claim "if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. Thus, a court need not determine whether defendant was prejudiced by counsel's alleged deficiencies if it determines that counsel's performance was not deficient. *See id.; Cacoperdo v. Demosthenes,* 37 F.3d 504, 508 (9th Cir. 1994) (defendant failed to show lack of thorough investigation of law and facts and therefore failed to meet his burden on the first prong of the *Strickland* test), *cert. denied,* 514 U.S. 1026, 115 S.Ct. 1378, 131 L.Ed.2d 232 (1995).

 *Second,* Karl claims that the district court erred in not allowing him to present expert medical and legal testimony regarding his trial counsel's performance. Karl alleges that he needed to present expert testimony to show what evidence could and should have been presented by his trial counsel. This claim lacks merit.

The district court allowed Karl to present the testimony of five attorneys regarding the standard of care used by Karl's attorney. These attorneys were all familiar with the case. Karl has failed to cite any authority, and we have found none, that supports his contention that only outside expert testimony can provide a basis on which to measure counsel's performance.

Furthermore, the majority of the proffered expert testimony rejected by the court went to the second prong of the *Strickland* test, which was not the subject of the hearing. Thus, the district court's refusal to allow the expert testimony based on its finding that the testimony would not be relevant to the limited scope of the evidentiary hearing was reasonable.[8] *See Wade v. Calderon,* 29 F.3d

---

**8.** The district court's finding that expert testimony was an inappropriate method for determining the relevant standard of care against which trial counsel's performance is to be measured was not erroneous. Although the determination of

1312, 1326–27 (9th Cir.1994) (upholding district court's limitation of defendant's expert evidence where the limitation was "reasonably designed to restrict the issue to competence of counsel, on the basis of what was reasonably known by counsel at the time of trial"), *cert. denied*, 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

Because a defendant is required to prove both prongs of the *Strickland* test before relief can be granted, the district court did not abuse its discretion in limiting the scope of the evidentiary hearing to determine whether defendant met the first prong of the *Strickland* test. *See Layton*, 855 F.2d at 1421. Furthermore, the district court's limitation of Karl's expert evidence was reasonably designed to restrict the issue of the hearing to the first prong of the *Strickland* test. Therefore, the district court did not abuse its discretion in refusing the expert medical and legal testimony proffered by Karl. *See Wade*, 29 F.3d at 1326–27.

### 2. *Performance of Karl's Counsel*

The United States Constitution guarantees that criminal defendants "shall enjoy the right to have the assistance of counsel for [their] defense." U.S. Const. amend VI. This constitutional right to counsel means that all defendants have the right to effective counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970).

To establish that he was deprived of his right to the effective assistance of counsel, a defendant must show that his counsel's performance falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. This inquiry must focus on "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065.

> Prevailing norms of practice ... are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Id.* at 688–89, 104 S.Ct. at 2065.

A reviewing court's scrutiny "of counsel's performance must be highly deferential." *Id.* There is a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

In deciding whether counsel's performance was deficient, we must judge the challenged conduct based on the facts of the particular case, "viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066. We must determine whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," keeping in mind that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

In analyzing counsel's performance, "[w]e will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir.), *cert. denied*, 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Karl claims that his counsel's performance was deficient in numerous ways. We will discuss each claim of ineffectiveness individually.

---

whether counsel has performed deficiently is a mixed question of law and fact, *see Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, as stated above, there is no requirement that expert testimony of outside attorneys be used to determine the appropriate standard of care.

### a. *Impulsivity Defense*

■ Karl claims that his background and his statements to the police indicate that he murdered Hartsock in a moment of rage after being kicked. He argues that this moment of rage and his "notorious lack of control" showed that he committed this crime on impulse and did not premeditate the crime. Thus, he claims that his attorney acted deficiently by failing to thoroughly investigate or pursue a defense of impulsivity on his behalf. The district court held that Karl's counsel was not ineffective on this issue, *see LaGrand v. Lewis*, 883 F.Supp. 451, 457–58 (D.Ariz.1995), and we agree.

In *State v. Christensen*, 129 Ariz. 32, 35–36, 628 P.2d 580, 583–84 (1981), the Arizona Supreme Court recognized that impulsivity could be a viable defense for premeditated murder because it tends to negate the mental element of premeditation. The defendant in *Christensen* was charged with having committed the premeditated murder of his wife. There was no evidence supporting a claim of felony murder. Therefore, the defendant could be found guilty of first-degree murder only if he was found to have premeditated the murder.

As found by the district court, Karl's counsel was clearly aware of the *Christensen* impulsivity defense. Prior to his representation of Karl, counsel represented a defendant in a case in which the impulsivity defense and *Christensen* were discussed. *See State v. Ramos*, 133 Ariz. 12, 648 P.2d 127 (App. 1981), *vacated*, 133 Ariz. 4, 648 P.2d 119 (1982).

Furthermore, Karl's counsel did not ignore evidence of defendant's impulsivity. Impulsivity evidence was presented during trial through the testimony of Walter and argued by Karl's attorney during closing argument. However, counsel apparently made a decision to not pursue the impulsivity defense more fully.[9]

Such a decision is supported by the record, which reveals the futility of an impulsivity defense. As the district court stated:

> Prior to Ken Hartsock being stabbed, Walter LaGrand had stated that he was going to kill the bank manager if the bank man-

ager was lying about being unable to open the vault. Before Dawn Lopez was permitted to leave the bank to turn off her headlights, she was told that if she did not return, Ken Hartsock would be killed. The bank manager was stabbed twenty-four times and Dawn Lopez was stabbed at least seven times. After Ken Hartsock was repeatedly stabbed, either [Karl] or Walter LaGrand was overheard to say: "Just make sure he's dead." Ms. Lopez testified that she heard both [Karl] and Walter LaGrand make such a statement. This evidence belies a claim of impulsivity.

*LaGrand*, 883 F.Supp. at 458.

Karl's present counsel have spent much time and effort in gathering further evidence and opinion to support the impulsivity defense. However, fleshing it out further makes it no better. Karl's presentation does not overcome the presumption of soundness under *Strickland*. Impulsivity was absolutely no defense to the felony-murder charge, which was the State's principal claim. In fact, premeditated murder remained in the case only because the trial court rejected the State's objection to the defendants' requested instruction on premeditated murder. In addition, pursuit of the impulsivity defense, like the insanity defense, would have necessarily brought Karl's prior record into the case. Counsel's performance was not deficient. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066–67.

### b. *Insanity Defense*

■ Karl claims that his attorney rendered ineffective assistance by failing to pursue an insanity defense. We reject this claim.

Karl's counsel researched the possibility of an insanity defense at length. Karl was examined by two doctors, psychologist Dr. Lewis Hertz and psychiatrist Dr. Edward Meshorer. Neither doctor's reports suggested an insanity defense was available to Karl. Dr. Hertz reported that Karl "knew right from wrong," negating use of the *M'Naughten* test for insanity. Dr. Meshorer's report, while not addressing the *M'Naughten* test,

---

**9.** Trial counsel testified during the evidentiary hearing, but he had reviewed very little of the file, and had little or no recollection of why he did anything during his representation of Karl.

gave no indication that an insanity defense would be a viable option for Karl. As the Arizona Supreme Court pointed out: "[N]o evidence of *M'Naughten* insanity existed." *State v. LaGrand,* 152 Ariz. 483, 485, 733 P.2d 1066, 1068 (1987).

Furthermore, if Karl's counsel had pursued an insanity defense, Arizona procedure would have opened up Karl's juvenile record to inspection and exposed his past to scrutiny. *See State v. Rodriguez,* 126 Ariz. 28, 31, 612 P.2d 484, 487 (1980). As the district court stated:

> Had [Karl's] counsel opened the door to [Karl's] past, the jury would have learned of a lengthy and violent criminal history. [Karl's] presentence reports indicate that less than three months before the events of this case occurred, on two separate occasions [Karl] committed armed robberies and kidnappings at Tucson grocery stores, and had prepared to commit another armed robbery at a third grocery store. When the murder of Ken Hartsock occurred, [Karl] had been released on bail while awaiting trial for armed robbery and kidnapping.
>
> As a juvenile, [Karl] was adjudicated delinquent for multiple burglaries, armed robbery and kidnapping.

*LaGrand,* 883 F.Supp. at 458.

Because there was a lack of evidence supporting an insanity defense, and because pursuing an insanity defense would have made Karl's lengthy and violent criminal history admissible, counsel's decision not to pursue the insanity defense was reasonable and did not constitute ineffective assistance.

### c. *Suppression of Karl's Confession*

■ After being arrested, Karl made two confessions to the police wherein he admitted committing the murder and stated that it was done in a moment of rage. Karl's previous attorney succeeded in having the confessions suppressed on the grounds that the confessions were involuntary and that Karl had not received his *Miranda* warnings.

After Karl's trial counsel became the lead counsel, he decided that the confessions would be useful at sentencing. The confessions contained statements that made the murder seem less heinous than the eyewitness testimony of Ms. Lopez. If Karl was convicted of first-degree murder, counsel wanted to use the confessions at sentencing in order to mitigate the sentence. Trial counsel sought reversal of the trial court's decision of involuntariness. The trial court agreed, and although the statements were inadmissible at trial due to the lack of a *Miranda* warning, the statements became admissible at sentencing.

Karl claims that his counsel acted ineffectively because counsel changed strategies on whether or not the confessions should be suppressed. We reject this claim.

Previous counsel's decision to seek suppression of the confessions was reasonable. The confessions, while evidencing impulsivity, also contained statements that were highly incriminating because they tended to place the entire blame for Hartsock's death on Karl. Previous counsel believed that Karl was confessing to something that he did not do. Eyewitness testimony contradicted what Karl had confessed to. Thus, previous counsel believed that Karl's confessions would be harmful to the case and therefore made a decision to seek suppression, an effort in which trial counsel participated.

Trial counsel's decision to seek retraction of the trial court's ruling to the extent that the confessions were involuntary was also reasonable. This enabled counsel to exclude the confessions when they would have been the most damaging—during the guilt finding phase—and utilize them at a time when they could prove useful—during sentencing.

However, Karl claims that the use of the confessions at sentencing was only useful to Walter and that trial counsel's decision to have the confessions admissible during sentencing was therefore ineffective. We disagree. The confessions revealed a less egregious crime than that presented by the eyewitness testimony of Ms. Lopez. The sentencing was to be done by the trial judge, who would have already heard Ms. Lopez's testimony. Thus, counsel introduced the confessions at the sentencing phase, with the possibility that Karl's version of the events would offset the testimony of Ms. Lopez. In the absence of the confessions, the sentencer would have no record

evidence of Karl's conduct except that of Ms. Lopez. This use of Karl's confessions during sentencing was a sound and reasonable strategic decision by Karl's trial counsel and, as such, does not constitute ineffective assistance.

### d. *Interview and Examination of Witnesses*

■ Karl argues that his counsel acted ineffectively by failing to interview and examine all of the witnesses at trial. We are not persuaded.

Prior to the time that trial counsel was appointed to represent Karl, all of the witnesses had been interviewed. Trial counsel reviewed the transcripts of these interviews. An investigator had also been working on the case prior to trial counsel's appointment, and trial counsel had access to, and reviewed, this investigator's reports. Trial counsel put in the equivalent of twenty-seven eight-hour days in trial preparation. He personally interviewed the only eyewitness, Ms. Lopez. The fact that trial counsel did not personally interview each witness does not constitute ineffective assistance. *See Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir. 1986) (trial counsel does not need to interview a witness if the witness's account is fairly known to counsel).

At trial, Karl's trial counsel was very quiet. Of the eighteen witnesses called by the Government, trial counsel cross-examined only two. One of the witnesses cross-examined by trial counsel was Ms. Lopez.

The Arizona Supreme Court held:

> Although trial counsel here kept an exceedingly low profile, we cannot say that his performance was so deficient as to compromise the adversarial nature of the trial. . . . Failure to cross-examine most witnesses was not deficient because codefendant's counsel did an excellent job of cross-examining them. Counsel did cross-examine Dawn Lopez, and establish that Karl was kicked. While we normally expect to see more vigorous representation from counsel, particularly in a death penalty case, we cannot say that counsel's trial performance was ineffective.

*LaGrand,* 152 Ariz. at 486, 733 P.2d at 1069. We agree.

The trial court's sequence of examination of witnesses resulted in Walter's counsel cross-examining each of the State's witnesses prior to Karl's trial counsel having that opportunity. All parties agree that Walter's counsel did an exceptional job cross-examining the witnesses. Thus, there was not much left to cross-examine when Karl's counsel was allowed to address the witness. If Karl's counsel repeated the questions asked by Walter's counsel, any negative answers would simply have been magnified in the jury's mind. Karl's counsel made a reasonable decision not to add to the questioning of most of the witnesses.

The strategies of respective defense counsel at trial were not nearly as antagonistic as Karl now urges. The evidence against Karl and Walter overlapped. Questions asked by Walter's counsel often inured to the benefit of Karl. In fact, both brothers had the same interests as against each witness except Ms. Lopez. Walter's counsel presented expert testimony regarding flaws associated with eyewitness testimony and extensively cross-examined Ms. Lopez regarding prior inconsistent statements, both of which benefited Karl. In addition, Karl's trial counsel cross-examined Ms. Lopez and attempted to elicit responses from her that would have aided Karl in establishing that his actions were the result of an impulsive reaction rather than premeditation.

Although Karl's trial counsel's performance was not perfect, it was not so unreasonable as to overcome the presumption that, under the circumstances, counsel's conduct was within the wide range of competent professional assistance. Karl's trial counsel's performance was therefore not ineffective. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65.

### e. *Zealous Representation*

Karl claims that the totality of his counsel's representation was not effective, pointing out that counsel did not give an opening statement, only cross-examined two witnesses, and was inexperienced. In this sense, Karl asserts, his attorney acted as a neutral observer rather than a zealous advo-

cate. But trial counsel was not the "potted plant" that Karl now paints him as.

Karl's counsel filed several pretrial motions, which were joined by Walter's counsel, as well as joining in motions filed by Walter's counsel. He persisted in pursuing the psychological test when the first results were inconclusive and finally obtained a usable result when the questions were read to Karl. He examined Ms. Lopez during the hearing on the identification of the defendants, as well as joining in motions filed by Walter's counsel. Trial counsel also questioned well over half of the available prospective jurors during the individual *voir dire.*

■ Trial counsel's conduct during trial was not so limited as to be ineffective. First, the failure to give an opening statement did not render trial counsel's assistance ineffective. Counsel did not waive opening statement, but rather chose to reserve it and wait until he heard all of the state's evidence before making an opening statement. After the closing of the state's case, counsel chose not to put on any witnesses. Trial counsel thus lost the opportunity to give an opening statement. This was a reasonable strategic decision by counsel and did not constitute ineffective assistance. *See United States v. Rodriguez–Ramirez*, 777 F.2d 454, 458 (9th Cir.1985) (the timing of opening statement, including the decision on whether or not to make one, is a trial tactic and does not constitute a basis for a claim of ineffective assistance).

■ Karl argues that trial counsel's inexperience rendered his assistance ineffective. In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance.

Finally, as stated previously, trial counsel's decision to cross-examine only two of the State's witnesses did not constitute ineffective assistance. Most of the testimony applied to both defendants. The witnesses did not, for the most part, distinguish between Walter and Karl. Cross-examination simply because it was permissible would have served no purpose. The one conspicuous exception was Dawn Lopez, and trial counsel did cross-examine her.

Although Karl's counsel was not very active during the trial, there is nothing to suggest that he was ineffective. Walter's counsel presented numerous arguments that benefitted both parties equally. Karl's counsel made a reasonable decision to "lay low" and allow Walter's arguments to represent them both. There was nothing to be gained by repeating the same arguments advanced by another attorney. Although Karl's counsel chose not to argue every point, his representation did not fall below the reasonably competent performance guaranteed by the Constitution. *See Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir.1992) (The Constitution "requires a good deal less than maximum performance."), *cert. denied*, 515 U.S. 1165, 115 S.Ct. 2624, 132 L.Ed.2d 865 (1995).

#### f. *Mitigation*

■ Karl claims that his counsel failed to competently investigate, prepare and present evidence at the mitigation hearing. We reject this claim.

The record shows that Karl's counsel presented numerous mitigating factors at the sentencing hearing. Counsel called a psychiatrist to testify about Karl's impulsiveness and introduced a report by a clinical psychologist. Counsel introduced Karl's confessions into evidence because he thought they presented a less egregious account of the events in the bank than the eyewitness account and because it bolstered Karl's impulsivity defense.

Furthermore, Walter's counsel introduced extensive mitigation evidence which applied equally to both Walter and Karl. Walter's counsel called Walter and Karl's sister to present mitigation evidence and her testimony about the nature of the LaGrand family applied equally to Karl and Walter.

We cannot say that counsel's performance fell outside the wide range of reasonable professional assistance. Counsel's assistance was therefore not ineffective. *See Paradis v. Arave*, 20 F.3d 950, 959 (9th Cir.1994) (counsel was not ineffective despite defendant's claim that counsel called only one mitigation witness and failed to develop information regarding defendant's oppressive upbringing and the fact that he was easily angered), *cert.*

*denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995).

### 3. *Estoppel*

■ Karl's present counsel submitted an affidavit of trial counsel in support of the claim that trial counsel had been ineffective. The affidavit was apparently prepared by present counsel. In response, the Arizona Attorney General's office sent a copy of the affidavit to the Arizona State Bar, pursuant to obligations under the State Bar's Ethical Rules, suggesting that Mr. Gerson, Karl's trial counsel, had admitted a violation of the Ethical Rules requiring competent representation.

Karl now argues that the State is estopped to continue to contend that trial counsel provided effective representation to Karl. The basic argument is that the State had asserted that trial counsel was incompetent and ineffective.

Karl's claim has no merit. The State has contended throughout all proceedings that trial counsel met the *Strickland* standard. Its letter to the bar did not say that trial counsel was incompetent and ineffective, but that his admissions demonstrated a violation of the Ethical Rules. If trial counsel, in falling on his sword, had admitted he was ineffective, the Attorney General's office believed it had a professional obligation under the Ethical Rules to bring it to the bar's attention. This is not sufficient to estop the State from continuing to contend, as it has throughout, that Karl received adequate representation.

### B. *Karl's Motion for New Counsel*

■ Shortly before trial, the trial court considered and rejected, after inquiry of Karl, his "Declaration of Conflict Between Attorney and Client" filed some forty-five days prior. The declaration said that trial counsel had failed to come to the prison to visit Karl in order to discuss the defense which the defendant wished to use.

■ In reviewing the rejection of defendant's request for new counsel, we look at three factors: the timeliness of the request; the adequacy of the trial court's inquiry; and "whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication between the defendant and his attorney." *Bland v. California Dep't of Corrections,* 20 F.3d 1469, 1475 (9th Cir.) (citation omitted), *cert. denied,* 513 U.S. 947, 115 S.Ct. 357, 130 L.Ed.2d 311 (1994).

■ Here, Karl's request was filed forty-five days before trial, so it was timely. The trial court's inquiry went to the relationship between Karl and his trial counsel, not to the legal competency of trial counsel. *See id.* at 1476. The inquiry was adequate under the circumstances and did not reveal a total lack of communication between Karl and trial counsel.

Karl complained of inadequate time in meetings and of gloomy predictions by trial counsel. But the record discloses no total failure of communication. In fact, just moments before considering Karl's declaration, the trial court inquired about the pending motion for a mental condition examination. Trial counsel said that a decision had been made to withdraw the motion, stating both that "we've" decided and "I've" decided to withdraw the motion. The following exchange took place:

THE COURT: Who decided?

MR. GERSON: I did some time ago.

THE COURT: Is that what your client wants?

MR. GERSON: I've discussed it with him. He's not indicated otherwise.

THE COURT: Well, unless he speaks up right now, I'm going to assume that you're speaking for him.

DEFENDANT KARL LaGRAND: Yes, he's speaking for me.

In *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), the Supreme Court considered a similar claim. The assistant public defender assigned to the case was replaced just before trial because of health problems. Slappy complained that the new public defender did not have enough time to prepare, that his new lawyer had not talked to him much, and that the new lawyer told him he had no defense to the charges. In holding that the trial court properly denied Slappy's claims, the Supreme Court specifically rejected the argument that the Sixth

Amendment guaranteed a defendant a "meaningful relationship" with his lawyer. *Id.* at 13–14, 103 S.Ct. at 1617–18.

■ Karl also argues that he was entitled to the appointment of a new lawyer to represent him in his request for a change in trial counsel. Karl cites no authority for this novel extension of the right to counsel,· and we have found none. Karl had counsel at the time of his request who did not oppose the request. A motion to replace a criminal defendant's trial counsel admittedly creates a delicate situation for the lawyer, the defendant and the court. But bringing in a new lawyer is not required to protect the defendant's rights. The obligation of the trial court to inquire is by now well known, and an appropriate inquiry made by the trial judge will disclose whether the relationship has deteriorated to the point that communication has been destroyed. The defendant's self-interest and his lawyer's continuing professional obligation are sufficient to enable the trial court to make the necessary determination.

### CONCLUSION

The judgment of the district court denying the petitions for writ of habeas corpus is AFFIRMED.

PREGERSON, Circuit Judge, dissenting:

I dissent because I believe that the LaGrands' challenge to Arizona's lethal gas statute is ripe for review.

The LaGrands are condemned prisoners in Arizona. Under Arizona's death penalty statute, the LaGrands will be executed by lethal injection unless they choose lethal gas. Ariz.Rev.Stat. § 13–704(B). In their petitions for habeas corpus, the LaGrands argue that execution by lethal gas is cruel and unusual punishment prohibited by the Eighth Amendment.

Because the LaGrands have not yet chosen lethal gas as the method of execution, the majority concludes that the LaGrands's challenge to the lethal gas statute "is not ripe and cannot be considered." In *Campbell v. Wood,* 18 F.3d 662 (9th Cir.1994) (en banc), however, we considered—and· rejected—the mirror image of this theory: namely, that an Eighth Amendment challenge to a "choice" statute is nonjusticiable because a prisoner can choose a means of execution that renders the controversy moot. We held, in circumstances almost identical to those involved here, that a prisoner's challenge to Washington's death penalty statute *was* justiciable. *Id.* at 681. I can discern no principled distinction between the present case and *Campbell* to support their conflicting outcomes.

Moreover, the majority's opinion conflicts with established Supreme Court pronouncements on ripeness. In *Thomas v. Union Carbide Agricultural Products,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985), the Supreme Court determined that an issue is ripe for adjudication if it is "purely legal, and will not be clarified by further factual development." The LaGrands's claim is a purely legal one, and postponing a determination on the merits will not change the legal basis for decision.

### I. JUSTICIABILITY OF A PRISONER'S CHALLENGE TO A DEATH PENALTY STATUTE

In *Campbell,* Charles Campbell, a condemned prisoner, challenged Washington's death penalty statute. *Campbell,* 18 F.3d 662. The statute provided for death by hanging unless the defendant chose lethal injection. *Id.* at 680 (citing Wash. Rev.Code 10.95.180(1)). Campbell argued that death by hanging was cruel and unusual punishment and that the statute therefore violated the Eighth Amendment. The State of Washington argued that Campbell's claim was nonjusticiable because he could render the controversy moot by choosing lethal injection instead of hanging. *Id.* at 681.

·An en banc panel of this court unanimously rejected the State's argument. We stated that the "State's focus on Campbell's ability to choose lethal injection is misplaced" because the government may not "cloak unconstitutional punishments in the mantle of 'choice.' " *Id.* at 680–81.

We illustrated this principle with several of our earlier decisions. *Id.* (discussing *Dear Wing Jung v. United States,* 312 F.2d 73 (9th Cir.1962); *United States v. Terrigno,* 838 F.2d 371 (9th Cir.1988); and *United States v.*

*Consuelo–Gonzalez,* 521 F.2d 259 (9th Cir. 1975)). In *Dear Wing Jung,* for instance, we noted that departure from the United States as a condition of suspending a sentence was either cruel and unusual punishment or a denial of due process. We held that the condition did not escape review on the ground that the defendant could choose the constitutional punishment of a prison term: "It is not enough for the government to answer that such condition merely gave the defendant a 'choice.' For instance, if the condition were that the defendant must join a certain church, that would be an unconstitutional condition upon the sentence." *Dear Wing Jung,* 312 F.2d at 75–76.

Likewise, in *Terrigno* and *Consuelo–Gonzalez,* we considered the constitutionality of probation conditions, although in those cases as well, the defendant could have chosen to remain incarcerated. *Terrigno,* 838 F.2d at 374 (considering whether probation condition violated defendant's First Amendment rights); *Consuelo–Gonzalez,* 521 F.2d at 264 (considering whether probation condition violated defendant's Fourth Amendment rights). In light of these decisions, we held that Cambell's challenge to hanging was justiciable.

I fail to understand why Campbell's mere indication that he would elect death by hanging makes his claim more justiciable than the LaGrands's claim. Campbell's indication that he would choose death by hanging was not binding and not final. Indeed, Campbell's "choice" was not even specifically articulated-he said that he would be silent, which would result, by default, in death by hanging. When viewed in terms of legally binding, final decisions, the posture of the LaGrands's challenge is identical to that of Campbell.

Furthermore, the cases relied on in *Campbell* do not make the distinction that the majority makes. In fact, it appears that the prisoners in those cases-like the prisoners here-had not chosen the unconstitutional method of execution. *See Dear Wing Jung,* 312 F.2d at 73 (parenthetical); *Terrigno,* 838 F.2d at 374 (parenthetical); *Consuelo–Gonzalez,* 521 F.2d at 264 (parenthetical). Nor, apparently, did they "consistently maintain" that they would remain silent and elect, by default, the challenged method of death. Nevertheless, their claims were justiciable.

It is unreasonable to say that we will not decide whether the LaGrands claim is unconstitutional until the LaGrands choose the very method that they are challenging as cruel and unusual. Such a legal system would subject individuals to actual cruel or unusual punishment under an unconstitutional law until someone chooses lethal gas in order to assert a legal challenge against it.

## II. SUPREME COURT LAW ON RIPENESS

The majority correctly chose the two-part test of *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) to determine the ripeness of the LaGrands's claim. This test requires the court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. The majority is mistaken, however, in its conclusion that this case is not ripe under *Abbott Laboratories.*

### A. Fitness for Judicial Review

The majority insists on relying on the doctrine of ripeness as a justification for its delay in addressing the constitutionality of the Arizona death penalty statute. The majority's decision is inconsistent with the rationale of *Abbott Laboratories* and *Thomas.* In *Abbott Laboratories,* the Court found that where "the issue tendered is a purely legal one," the first prong of the ripeness test is satisfied. *Id.* As was true in *Abbott Laboratories,* the LaGrands's challenge presents a purely legal issue: Is Arizona's death penalty statute constitutional? In *Thomas,* the Court held that an issue is ripe if the issue "will not be clarified by further factual development." *Thomas v. Union Carbide Agric. Prods.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985). Because the issue in this case "will not be clarified by further factual development," the LaGrands's challenge is purely legal and is therefore fit for judicial review.

No interest is served by delaying the resolution of the LaGrands purely legal claim. Whether or not the LaGrands ultimately chose lethal gas as the method of their execution will have absolutely no effect on the

constitutional question that the LaGrands have raised.

## B. Hardship to the Parties

Withholding court consideration will cause hardship to all parties involved—including, incidently, this court.

What should the LaGrands do after reading the majority's opinion? The lesson appears to be that if the LaGrands, like Campbell, "consistently maintain" that they will elect an arguably unconstitutional method of execution, then the LaGrands can challenge that method. Therefore, the obvious course for the LaGrands is to begin to "consistently maintain" that they will choose gas. (They need not *actually* choose gas.) The LaGrands's claim will then be ripe and will someday return to our court.[1]

Postponing review of the LaGrands's Eighth Amendment challenge will cause hardship to the LaGrands as well. Instead of receiving this court's deliberate and thoughtful consideration of their challenge, the LaGrands will be forced to present their claim in a "last-minute" habeas petition.

Nor does Arizona gain anything from the majority's reluctance to address the issue. In fact, the majority's decision frustrates Arizona's alleged interest in executing the LaGrands without undue delay by providing another ground for a future "last-minute" appeal.

Finally, I note the prudential concern in addressing the LaGrands's claims now. The majority opinion conflicts with the federal policy to resolve habeas petitions as early as possible. The majority's decision defeats this policy by postponing a decision on the merits until after the LaGrands choose to be executed by lethal gas. Do we want to see the LaGrands's challenge to lethal gas presented by a flurry of faxes as the hour of execution looms? Do we wish to make an important decision in harried circumstances?

Under the majority's decision, Arizona has successfully accomplished exactly what we feared in *Campbell*: it has cloaked an unconstitutional punishment in the mantle of "choice." *Campbell*, 18 F.3d at 680. Because the majority has offered no satisfactory explanation why Cambell's claim was justiciable while the LaGrands's claim is not, I respectfully dissent.

---

1. Arizona's "choice" statute at issue provides in part:

§ 13–704. Method of infliction of sentence of death

. . . .

B. A defendant who is sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas at least twenty days before the execution date. If the defendant fails to choose either lethal injection or lethal gas, the penalty of death shall be inflicted by lethal injection. Ariz.Rev.Stat. § 13–704. Nothing in my reading of the statute prevents a prisoner from "maintaining" that he will choose gas, and then actually choose lethal injection twenty days before his execution date.

In fact, nothing in the statute seems to preclude a defendant from *actually* choosing gas well before the twenty-day mark, and then changing his mind and making lethal injection his final choice.

The panel's ripeness analysis would encourage this choice-changing, which is a traumatizing experience for the defendant and a bureaucratic headache for the judicial system.